[No. 47498–2. En Banc. February 17, 1983.]

THE STATE OF WASHINGTON, *Respondent*, v. RODNEY K.
CRENSHAW, *Petitioner.*

790

*Rusing & Platte,* by *Richard C. Platte,* for petitioner.

*David S. McEachran, Prosecuting Attorney,* for respondent.

BRACHTENBACH, J.—Rodney Crenshaw was convicted by a jury of first degree murder. Finding that the trial court committed no reversible error, we affirm the conviction.

Petitioner Rodney Crenshaw pleaded not guilty and not guilty by reason of insanity to the charge of first degree murder of his wife, Karen Crenshaw. A jury found him guilty. Petitioner appealed his conviction, assigning error to a number of the trial court's rulings. After the Court of Appeals affirmed the trial court in all respects (*State v. Crenshaw,* 27 Wn. App. 326, 617 P.2d 1041 (1980)), petitioner raised the same issues before this court.

We first heard the case on June 8, 1981, and it was reheard on September 8, 1982. Having considered petitioner's arguments in depth, we affirm the Court of Appeals. As the Court of Appeals opinion adequately addresses most of the issues, its reasoning need not be reproduced here. *See State v. Crenshaw, supra.* Two issues deserve further elaboration, however: first, that of the propriety of the insanity defense instruction which explained the right–wrong standard in the *M'Naghten* test in terms of "legal" right and wrong, and second, that of the admissibility of the five photographs of the decapitated victim.

Before turning to the legal issues, the facts of the case must be recounted. While defendant and his wife were on their honeymoon in Canada, petitioner was deported as a result of his participation in a brawl. He secured a motel room in Blaine, Washington, and waited for his wife to join him. When she arrived 2 days later, he immediately thought she had been unfaithful—he sensed "it wasn't the same Karen . . . she'd been with someone else."

Petitioner did not mention his suspicions to his wife;

instead he took her to the motel room and beat her unconscious. He then went to a nearby store, stole a knife, and returned to stab his wife 24 times, inflicting a fatal wound. He left again, drove to a nearby farm where he had been employed and borrowed an ax. Upon returning to the motel room, he decapitated his wife with such force that the ax marks cut into the concrete floor under the carpet and splattered blood throughout the room.

Petitioner then proceeded to conceal his actions. He placed the body in a blanket, the head in a pillowcase, and put both in his wife's car. Next, he went to a service station, borrowed a bucket and sponge, and cleaned the room of blood and fingerprints. Before leaving, petitioner also spoke with the motel manager about a phone bill, then chatted with him for awhile over a beer.

When Crenshaw left the motel he drove to a remote area 25 miles away where he hid the two parts of the body in thick brush. He then fled, driving to the Hoquiam area, about 200 miles from the scene of the crime. There he picked up two hitchhikers, told them of his crime, and enlisted their aid in disposing of his wife's car in a river. The hitchhikers contacted the police and Crenshaw was apprehended shortly thereafter. He voluntarily confessed to the crime.

The defense of not guilty by reason of insanity was a major issue at trial. Crenshaw testified that he followed the Moscovite religious faith, and that it would be improper for a Moscovite not to kill his wife if she committed adultery. Crenshaw also has a history of mental problems, for which he has been hospitalized in the past. The jury, however, rejected petitioner's insanity defense, and found him guilty of murder in the first degree.

## A
### Insanity Defense Instruction

Insanity is an affirmative defense the defendant must establish by a preponderance of the evidence. RCW 9A.12-.010. Sanity is presumed, even with a history of prior insti-

tutional commitments from which the individual was released upon sufficient recovery. *State v. McDonald,* 89 Wn.2d 256, 571 P.2d 930 (1977).

The insanity defense is not available to all who are mentally deficient or deranged; legal insanity has a different meaning and a different purpose than the concept of medical insanity. *State v. White,* 60 Wn.2d 551, 589, 374 P.2d 942 (1962). A verdict of not guilty by reason of insanity completely absolves a defendant of any criminal responsibility. Therefore, "the defense is available only to those persons who have lost contact with reality so completely that they are beyond any of the influences of the criminal law." *White,* at 590.

Petitioner assigned error to insanity defense instruction 10 which reads:

> In addition to the plea of not guilty, the defendant has entered a plea of insanity existing at the time of the act charged.
>
> Insanity existing at the time of the commission of the act charged is a defense.
>
> For a defendant to be found not guilty by reason of insanity you must find that, as a result of mental disease or defect, the defendant's mind was affected to such an extent that the defendant was unable to perceive the nature and quality of the acts with which the defendant is charged or was unable to tell right from wrong with reference to the particular acts with which defendant is charged.
>
> What is meant by the terms "right and wrong" refers to knowledge of a person at the time of committing an act that he was acting contrary to the law.

Clerk's Papers, at 27. But for the last paragraph, this instruction tracks the language of WPIC 20.01, which is the *M'Naghten* test as codified in RCW 9A.12.010. *See* 11 Wash. Prac. 137 (1977). Petitioner contends, however, that the trial court erred in defining "right and wrong" as legal right and wrong rather than in the moral sense.

We find this instruction was not reversible error on three alternative grounds: (1) The *M'Naghten* opinion amply supports the "legal" wrong definition as used in this case,

(2) under these facts, "moral" wrong and "legal" wrong are synonymous, therefore the "legal" wrong definition did not alter the meaning of the test, and (3) because Crenshaw failed to prove other elements of the insanity defense, any error in the definition of wrong was harmless.

I

The definition of the term "wrong" in the *M'Naghten* test has been considered and disputed by many legal scholars. *See, e.g.,* A. Goldstein, *The Insanity Defense* 51–53 (1967); H. Fingarette, *The Meaning of Criminal Insanity* 153–57 (1972); S. Glueck, *Mental Disorder and the Criminal Law* 184–85 (1925); H. Weihofen, *Mental Disorder as a Criminal Defense* 77 (1954); Cohen, *Criminal Responsibility and the Knowledge of Right and Wrong,* 14 U. Miami L. Rev. 30, 49–50 (1959); Morris, *Criminal Insanity,* 43 Wash. L. Rev. 583 (1968). Courts from other jurisdictions are divided on the issue. *Cf. People v. Perez,* 9 Cal. 3d 651, 510 P.2d 1026, 108 Cal. Rptr. 474 (1973) ("wrong" restricted to mean legally wrong); *State v. Corley,* 108 Ariz. 240, 495 P.2d 470 (1972) ("wrong" restricted to mean "morally" wrong); *People v. Wood,* 12 N.Y.2d 69, 187 N.E.2d 116, 236 N.Y.S.2d 44 (1962) ("wrong" means legally *and* morally wrong); *State v. Thorne,* 239 S.C. 164, 121 S.E.2d 623 (1961), *cert. denied,* 368 U.S. 979, 7 L. Ed. 2d 440, 82 S. Ct. 485 (1962) ("wrong" means either legally *or* morally wrong). In Washington, we have not addressed this issue previously.[1]

The confusion arises from apparent inconsistencies in the original *M'Naghten* case. In response to the House of Lords first question, the justices replied that if an accused knew he was acting contrary to law but acted under a partial

---

[1]The Court of Appeals correctly disapproved Professor Morris' suggestion that Washington's case law favors a "'morally'" wrong interpretation. *State v. Crenshaw,* 27 Wn. App. 326, 336 n.1, 617 P.2d 1041 (1980). This court has not previously adopted any definition of "wrong" for the *M'Naghten* test. The instruction in *State v. Davis,* 6 Wn.2d 696, 708, 108 P.2d 641 (1940), referring to "the moral qualities of the act", would now be improper in light of the subsequent statutory codification of the test. RCW 9A.12.010.

insane delusion that he was redressing or revenging some supposed grievance or injury, or producing some supposed public benefit, "he is nevertheless punishable . . . if he knew at the time of committing such crime that he was acting *contrary to law*; . . . *the law of the land*." (Italics ours.) *M'Naghten's Case*, 8 Eng. Rep. 718, 722 (1843). In this answer, the justices appear to approve the legal standard of wrong when there is evidence that the accused knew he was acting contrary to the law.

This has been characterized as inconsistent with the justices' response to the second and third questions, regarding how a jury should be instructed on the insanity defense:

> If the question were to be put [to a jury] as to the knowledge of the accused solely and exclusively with reference to the law of the land, it might tend to confound the jury, by inducing them to believe that an actual knowledge of the law of the land was essential in order to lead to a conviction; whereas the law is administered upon the principle that every one must be taken conclusively to know it, without proof that he does know it. If the accused was conscious that the act was one which he ought not to do, and if that act was at the same time contrary to the law of the land, he is punishable; and the usual course therefore has been to leave the question to the jury, whether the party accused had a sufficient degree of reason to know that he was doing an act that was wrong: and this course we think is correct, accompanied with such observations and explanations as the circumstances of each particular case may require.

*M'Naghten*, at 723. This response appears to require both that the accused be "conscious that the act was one which he ought not to do" and that the act be "contrary to the law."

■ A close examination of these answers, however, shows they are reconcilable in the context of this case. First, the similarities between the hypothetical in the first question and Crenshaw's situation should afford that answer great weight. If, arguendo, Crenshaw was delusional, his delusion was only partial, for it related only to his perceptions of his wife's infidelity. His behavior towards oth-

ers, *i.e.,* the motel manager and the woman who loaned him the ax, at the time of the killing was normal. Crenshaw also "knew he was acting contrary to law" (*M'Naghten,* at 720), as evidenced by his sophisticated attempts to hide his crime and by the expert, psychiatric testimony. Furthermore, he acted with a view "of redressing or revenging [the] supposed grievance" (*M'Naghten,* at 720) of his wife's infidelity. Thus, the Crenshaw situation fits perfectly into the first hypothetical, and the trial court understandably relied on this passage in approving the challenged instruction.

Second, the answers to the second and third questions certainly do not forbid the additional comment found in instruction 10. The justices expressly provided that the instruction could be "accompanied with such observations and explanations as the circumstances of each particular case may require." *M'Naghten,* at 723. In addition, the justices' hesitance to state the question exclusively with reference to the law stemmed from a fear that "it might tend to confound the jury, by inducing them to believe that an actual knowledge of the law of the land was essential in order to lead to a conviction". *M'Naghten,* at 723. Therefore, in cases such as this where actual knowledge of the law is not an issue, an instruction in terms of legal wrong would not be improper.

In short, *M'Naghten* supports the propriety of the trial court's instruction in several ways: (1) the justices' answer to the first question was more analogous to Crenshaw's fact situation, and that answer referred only to legal wrong, (2) the *M'Naghten* justices provided that in some cases an additional statement by the court would be acceptable, and (3) in this case there was no danger that the jury would be induced to believe that actual knowledge of the law was essential, since Crenshaw demonstrated that he knew the illegality of his acts. Thus, the facts here permit resolution of the inconsistencies in *M'Naghten* in favor of the "legal" wrong standard.

■ Such an interpretation is consistent with Washington's strict application of *M'Naghten.* This court's view has

been that "when M'Naghten is used, all who might possibly be deterred from the commission of criminal acts are included within the sanctions of the criminal law." *State v. White,* 60 Wn.2d 551, 592, 374 P.2d 942 (1962).

> [O]nly those persons "who have lost contact with reality so completely that they are beyond any of the influences of the criminal law," may have the benefit of the insanity defense in a criminal case.

*State v. McDonald,* 89 Wn.2d 256, 272, 571 P.2d 930 (1977), quoting *White,* at 590. Given this perspective, the trial court could assume that one who knew the illegality of his act was not necessarily "beyond any of the influences of the criminal law," thus finding support for the statement in instruction 10.

## II

Alternatively, the statement in instruction 10 may be approved because, in this case, legal wrong is synonymous with moral wrong. This conclusion is premised on two grounds.

First, in discussing the term "moral" wrong, it is important to note that it is society's morals, and not the individual's morals, that are the standard for judging moral wrong under *M'Naghten.* If wrong meant moral wrong judged by the individual's own conscience, this would seriously undermine the criminal law, for it would allow one who violated the law to be excused from criminal responsibility solely because, in his own conscience, his act was not morally wrong. H. Fingarette, *The Meaning of Criminal Insanity* 154 (1972); *see State v. Corley,* 108 Ariz. 240, 495 P.2d 470 (1972); *State v. Malumphy,* 105 Ariz. 200, 461 P.2d 677 (1969) (McFarland, J., concurring specially); *State v. Skaggs,* 120 Ariz. 467, 586 P.2d 1279 (1978). This principle was emphasized by Justice Cardozo:

> The anarchist is not at liberty to break the law because he reasons that all government is wrong. The devotee of a religious cult that enjoins polygamy or human sacrifice as a duty is not thereby relieved from responsibility before the law . . .

(Citations omitted.) *People v. Schmidt,* 216 N.Y. 324, 340, 110 N.E. 945, 950 (1915). More recently the Arizona Supreme Court stated:

We find no authority upholding the defendant's position that one suffering from a mental disease could be declared legally insane if he knew that the act was morally and legally wrong but he personally believed that act right. We believe that this would not be a sound rule, because it approaches the position of exonerating a defendant for his personal beliefs and does not take account of society's determination of defendant's capacity to conform his conduct to the law.

*State v. Corley, supra* at 243.

There is evidence on the record that Crenshaw knew his actions were wrong according to society's standards, as well as legally wrong. Dr. Belden testified:

I think Mr. Crenshaw is quite aware on one level that he is in conflict with the law *and with people.* However, this is not something that he personally invests his emotions in.

(Italics ours.) Report of Proceedings, at 657. We conclude that Crenshaw knew his acts were morally wrong from society's viewpoint and also knew his acts were illegal. His personal belief that it was his duty to kill his wife for her alleged infidelity cannot serve to exculpate him from legal responsibility for his acts.

■ A narrow exception to the societal standard of moral wrong has been drawn for instances wherein a party performs a criminal act, knowing it is morally and legally wrong, but believing, because of a mental defect, that the act is ordained by God: such would be the situation with a mother who kills her infant child to whom she is devotedly attached, believing that God has spoken to her and decreed the act. *See People v. Schmidt, supra* at 339. Although the woman knows that the law and society condemn the act, it would be unrealistic to hold her responsible for the crime, since her free will has been subsumed by her belief in the deific decree. *People v. Schmidt, supra.*

This exception is not available to Crenshaw, however.

Crenshaw argued only that he followed the Moscovite faith and that Moscovites believe it is their duty to kill an unfaithful wife. This is not the same as acting under a deific command. Instead, it is akin to "[t]he devotee of a religious cult that enjoins . . . human sacrifice as a duty [and] is *not* thereby relieved from responsibility before the law". (Italics ours.) *Schmidt,* at 340. Crenshaw's personal "Moscovite" beliefs are not equivalent to a deific decree and do not relieve him from responsibility for his acts.

Once moral wrong is equated with society's morals, the next step, equating moral and legal wrong, follows logically. The law is, for the most part, an expression of collective morality.

Most cases involving the insanity defense involve serious crimes for which society's moral judgment is identical with the legal standard. Morris, *Criminal Insanity,* 43 Wash. L. Rev. 583 (1968); S. Glueck, *Mental Disorder and the Criminal Law* (1925); A. Goldstein, *The Insanity Defense* (1967).

Therefore, a number of scholars have concluded that, as a practical matter, the way in which a court interprets the word "wrong" will have little effect on the eventual outcome of a case. Morris, *supra* at 604; S. Glueck, *supra* at 220; A. Goldstein, *supra* at 52.

As one scholar explained:

[S]ince by far the vast majority of cases in which insanity is pleaded as a defense to criminal prosecutions involves acts which are universally regarded as morally wicked as well as illegal, the hair–splitting distinction between legal and moral wrong need not be given much attention.

S. Glueck, at 184.

Society's morals and legal wrong are interchangeable concepts in the context of this case. Petitioner's crime, killing his wife by stabbing her 24 times then hacking off her head, is clearly contrary to society's morals as well as the law. Therefore by defining wrong in terms of legal wrong, the trial court did not alter the meaning of the *M'Naghten* test.

### III

■ We also find that, under any definition of wrong, Crenshaw did not qualify for the insanity defense under *M'Naghten*; therefore, any alleged error in that definition must be viewed as harmless. The alleged error here involved the interpretation of the statutory definition of the insanity defense. Crenshaw's right to an insanity defense instruction is not at issue. Therefore, the stringent, constitutional harmless error analysis is inapplicable. *Cf. State v. Cunningham*, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980) (constitutional harmless error standard not applied to statutory violation); *State v. Evans*, 96 Wn.2d 1, 6 n.1, 633 P.2d 83 (1981) (Brachtenbach, C.J., concurring) (distinguishing harmless error analyses for constitutional and nonconstitutional challenges). A nonconstitutional error does not require reversal of a criminal conviction unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred. *State v. Tharp*, 96 Wn.2d 591, 637 P.2d 961 (1981).

Here, any error is harmless for two alternate reasons. First, Crenshaw failed to prove an essential element of the defense because he did not prove his alleged delusions stemmed from a mental defect; second, he did not prove by a preponderance of the evidence that he was legally insane at the time of the crime.

■ In addition to an incapacity to know right from wrong, *M'Naghten* requires that such incapacity stem from a mental disease or defect. RCW 9A.12.010. Assuming, arguendo, that Crenshaw did not know right from wrong, he failed to prove that a mental defect was the cause of this inability.

Petitioner's insanity argument is premised on the following facts: (1) he is a Moscovite and Moscovites believe it is their duty to assassinate an unfaithful spouse; (2) he "knew", without asking, that his wife had been unfaithful when he met her in Blaine and this was equivalent to an insane delusion; and (3) at other times in his life, he had

been diagnosed as a paranoid personality and had been committed to mental institutions. A conscientious application of the *M'Naghten* rule demonstrates, however, that these factors do not afford petitioner the sanctuary of the insanity defense.

■ To begin, petitioner's Moscovite beliefs are irrelevant to the insanity defense, because they are not insane delusions. Some notion of morality, unrelated to a mental illness, which disagrees with the law and mores of our society is not an insane delusion. *State v. DiPaolo,* 34 N.J. 279, 168 A.2d 401 (1961).

Nor was petitioner's belief that his wife was unfaithful an insane delusion. Dr. Trowbridge, a psychiatrist, explained:

A man suspects his wife of being unfaithful. Certainly such suspicions are not necessarily delusional, even if they're ill based. Just because he suspected his wife of being unfaithful doesn't mean that he was crazy.

. . .

Certainly when a man kills his wife he doesn't do it in a rational way. No one ever does that rationally. But that is not to suggest that every time a man kills his wife he was [*sic*] insane.

Report of Proceedings, at 931–32.

■ Finally, evidence of prior commitments to mental institutions is not proof that one was *legally* insane at the time the criminal act was committed. *State v. McDonald,* 89 Wn.2d 256, 571 P.2d 930 (1977); *State v. DiPaolo, supra; State v. Foster,* 44 Hawaii 403, 354 P.2d 960 (1960). As we stated in *State v. McDonald, supra* at 272–73:

Those who are commonly regarded as "odd" or "unsound" or even "deranged" would not normally qualify [for the insanity defense]. Many, if not most, mentally ill persons presently being treated in the mental institutions of this state who are there under the test of "likelihood of serious harm to the person detained or to others," . . . would not meet the *M'Naghten* test, if charged with a crime.

Thus, petitioner does not establish the necessary connection between his criminal acts and his psychological prob-

lems to qualify for the insanity defense.

In addition, the preponderance of the evidence weighs against finding Crenshaw legally insane. All of the psychological experts, save one, testified that defendant was not insane at the time of the murder.[2] The only doctor who

---

[2]Dr. Kronenberg (psychiatrist, defense witness, examined Crenshaw 5 weeks after the crime):

Q. Doctor, was it your opinion that the defendant was not insane under the definition we have in our law?

A. That he was not insane?

Q. That he was not insane at the time of the act?

A. *At the time of the act, it is my opinion that he was not insane.*

(Italics ours.) Report of Proceedings, at 714.

Dr. Trowbridge (psychologist, State's rebuttal witness, examined Crenshaw 10 days after the crime):

A. . . . *We also felt that at the time of the alleged crime he could understand the difference between right and wrong and could appreciate the nature and quality of his conduct. In other words, he was legally sane.* We also felt that he was dangerous.

(Italics ours.) Report of Proceedings, at 913.

Dr. Allison (psychiatrist, State's rebuttal witness, examined Crenshaw 10 days after the crime):

Q. . . . [D]o you have an opinion within a reasonable degree of medical certainty as to whether Crenshaw could perceive the nature and quality of the act of killing Karen Crenshaw?

A. I have an opinion.

Q. What is that opinion, Doctor?

A. That *he knew what he was doing when he did it.*

Q. Do you also, based upon those factors, those same factors, have an opinion as to whether [Crenshaw] had the ability to distinguish right from wrong with reference to that act?

A. I feel *he knew the difference between right and wrong.*

(Italics ours.) Report of Proceedings, at 1018.

Dr. Mahaffy (psychiatrist, defense witness, saw defendant 1 month after crime):

A. [Crenshaw] felt that there were certain times when it was not only right but important for him to take things into his own hands rather than allow the process of the law to take over.

. . .

*[H]e was not psychotic and I felt from talking with him that he did understand what had happened and that he was operating under the belief that his act was praiseworthy.*

. . .

Q. I believe in your report you indicated *you felt that the defendant would understand at the time of the commission of the act of the killing, he understood really the nature and consequences of his act.*

concluded defendant (petitioner) was legally insane, Dr. Hunter, was a psychologist who had not examined petitioner for a year and a half.

Given the various qualifications of the experts, the time they spent with the petitioner, and the proximity in time of their examinations to the murder, the testimony does not establish by a preponderance of the evidence that petitioner was legally insane at the time of the murder.

Furthermore, in addition to the expert testimony, there was lay testimony that petitioner appeared rational at the time of the killing. After cleaning the motel room, Crenshaw resolved a phone bill dispute with the manager, then shared a beer with him without arousing any suspicion in the manager's mind. Also, the woman who gave him the ax testified as to his behavior the day before the murder:

> Well, he seemed very normal or I certainly wouldn't have handed him an ax or a hoe. He was polite, he done his work. He didn't, I wasn't afraid of him or anything. I mean we were just out there working and I certainly wouldn't have handed him an ax or anything like that if I would have thought that there was anything even remotely peculiar about him.

Report of Proceedings, at 442. And, with specific reference to the time when petitioner borrowed the ax to decapitate

---

A. *Right.*

Q. Is that correct?

A. Right.

(Italics ours.) Report of Proceedings, at 474–82.

Dr. Belden (psychologist, defense witness, examined Crenshaw 3 months after the crime):

Q. [Don't the facts] show that he knew the difference between right and wrong concerning this act?

A. Yes. It's obviously so. However, to put that in a perspective that seems right, as far as I can see it, his feeling of right and wrong was such a vague or such a small amount of influence in terms of what was going on with him at that time that it was for all practical purposes insignificant.

. . .

. . . *He felt justified in what he was doing but still aware that what he was doing was against the law and that it would put him in a pretty bad spot.*

(Italics ours.) Report of Proceedings, at 670–71.

his wife:

> Q. . . . did he seem rational to you?
> A. Oh, yes, he was very nice.
> Q. Did he seem coherent when he spoke to you?
> A. Oh, yes. . . .
>
> . . .
>
> Q. Did he appear to be sane to you then? . . .
> A. Yes. . . .

Report of Proceedings, at 436–42. Thus, at the same time that he was embroiled in the act of murdering his wife, he was rational, coherent, and sane in his dealings with others.

■ Finally, evidence of petitioner's calculated execution of the crime and his sophisticated attempts to avert discovery support a finding of sanity. *See State v. McDonald, supra.* Crenshaw performed the murder methodically, leaving the motel room twice to acquire the knife and ax necessary to perform the deed. Then, after the killing he scrubbed the motel room to clean up the blood and remove his fingerprints. Next, he drove 25 miles to hide the body in thick brush in a remote area. Finally, he drove several hundred miles and ditched the car in a river.

Such attempts to hide evidence of a crime manifest an awareness that the act was legally wrong. *State v. McDonald, supra; State v. Skaggs,* 120 Ariz. 467, 586 P.2d 1279 (1978); *State v. Law,* 270 S.C. 664, 244 S.E.2d 302 (1978). Moreover, petitioner testified that he did these things because he "didn't want to get caught". Report of Proceedings, at 886.

To summarize thus far, we find no error in instruction 10 for the following reasons: (1) As we interpret the *M'Naghten* case, it was not improper for the trial court to instruct with reference to the law of the land, under the facts of this case; (2) because the concept of moral wrong refers to the mores of society and not to the individual's morals, "moral" wrong is synonymous with "legal" wrong with a serious crime such as this one, therefore, instructing in terms of legal wrong did not alter the meaning of the *M'Naghten* rule; (3) any error was harmless because (a) Crenshaw did

not show that at the time of the crime his mind was affected as a result of a mental disease or defect and without this essential element the insanity defense was not available to him, and (b) an overwhelming preponderance of the evidence supports the finding that Crenshaw was not legally insane when he killed his wife. We thus conclude that the additional statement in instruction 10 was not improper, or, at the very least, that it was harmless error.

Nevertheless, we do not believe that, in the future, such a comment should be necessary. As the Legislature has chosen to codify the *M'Naghten* test in statutory form, it would be preferable to have this test presented to the jury without any elaboration. This would permit both parties to argue their theories of the case. It would also prevent the possibility that the jury would presume that ignorance of the law is a defense in cases wherein it may not be as clear as it was here that the person knew the illegality of his act. *See State v. Corley,* 108 Ariz. 240, 495 P.2d 470 (1972). Thus, we hold prospectively that as a general rule no definition of wrong should accompany an insanity defense instruction.

### IV

The statutory codification of the insanity defense in Washington has bearing on this case in two other respects. First, because the Legislature has spoken, we must ignore the arguments in support of the American Law Institute's insanity test. It is the Legislature, not the court, that has the authority to change statutory laws. Moreover, this issue is not properly before us, as it was not raised below. *State v. Smith,* 74 Wn.2d 744, 446 P.2d 571 (1968), *vacated as to imposition of death sentence,* 408 U.S. 934, 33 L. Ed. 2d 747, 92 S. Ct. 2852 (1972).

Second, the passage of RCW 9A.12.010 in 1975 casts a shadow over the continued validity of pre–1975 cases interpreting a nonstatutory *M'Naghten* test. For example, the instruction approved in *State v. Davis,* 6 Wn.2d 696, 708, 108 P.2d 641 (1940) differs from the *M'Naghten* rule as it is

applied today. *See State v. White,* 60 Wn.2d 551, 596–97, 374 P.2d 942 (1962) (Hunter, J., concurring in part and dissenting in part), *cert. denied,* 375 U.S. 883, 11 L. Ed. 2d 113, 84 S. Ct. 154 (1963). The *Davis* instruction and others similar to it were approved when *M'Naghten* was a court defined test. Now that the Legislature has acted, any instruction with language different from that in RCW 9A.12.010 is improper. To the extent that *State v. Davis, supra,* and other cases approve other statements of the rule, they are disapproved. *See State v. Tyler,* 77 Wn.2d 726, 466 P.2d 120 (1970), *vacated as to imposition of death sentence,* 408 U.S. 937, 33 L. Ed. 2d 756, 92 S. Ct. 2865 (1972); *State v. Reece,* 79 Wn.2d 453, 486 P.2d 1088 (1971); *State v. Quinlivan,* 81 Wn.2d 124, 499 P.2d 1268, 72 A.L.R.3d 835 (1972).

## B
### PHOTOGRAPHIC EVIDENCE

 Petitioner challenges the admission of five photographs of the victim. The admissibility of photographs is generally within the sound discretion of the trial court, and the trial court's ruling will not be disturbed on appeal, absent the showing of abuse of discretion. *State v. Adler,* 16 Wn. App. 459, 558 P.2d 817 (1976); *State v. Griffith,* 52 Wn.2d 721, 328 P.2d 897 (1958). Here, the trial judge obviously was aware of his discretionary function, for he ruled one photograph, that of the decapitated head alone, inadmissible. We find no abuse of discretion.

Accurate photographic representations are admissible, even if gruesome, if their probative value outweighs their prejudicial effect. *State v. Griffith, supra; State v. Adler, supra.* Throughout the trial Crenshaw maintained a not guilty plea, as well as his not guilty by reason of insanity plea. Therefore, the State was required to prove the fact of the murder as well as rebut the insanity defense. Moreover, Crenshaw's confession alone was not sufficient to establish the corpus delicti of the crime. *State v. Meyer,* 37 Wn.2d 759, 226 P.2d 204 (1951). In addition, some of the photo-

graphs were also probative to show the extent to which petitioner attempted to hide the body, which tended to show his knowledge of the wrongfulness of his act.

We adhere to our previous statement that "[a] bloody, brutal crime cannot be explained to a jury in a lily–white manner". *State v. Adams,* 76 Wn.2d 650, 656, 458 P.2d 558 (1969), *rev'd on other grounds,* 403 U.S. 947, 29 L. Ed. 2d 855, 91 S. Ct. 2273 (1971). Nevertheless, we take this opportunity to warn prosecutors that we look unfavorably on the admission of repetitious, inflammatory photographs.

Prosecutors as well as trial courts must exercise their discretion in the use of gruesome photographs. The statement that "the State had the right to prove its case up to the hilt in whatever manner it chose," must be read to mean only that the State may present ample evidence to prove every element of the crime. *State v. Adler, supra* at 465. Prosecutors are not given a carte blanche to introduce every piece of admissible evidence if the cumulative effect of such evidence is inflammatory and unnecessary. In other words, in such situations where proof of the criminal act may be amply proven through testimony and noninflammatory evidence, we caution prosecutors to use restraint in their reliance on gruesome and repetitive photographs. *Cf. United States v. Payner,* 447 U.S. 727, 735 n.7, 65 L. Ed. 2d 468, 100 S. Ct. 2439 (1980) (recognizing the court's power to supervise the administration of criminal justice among the parties before the bar).

As stated above, we find that the Court of Appeals thoughtfully and correctly resolved the other assignments of error raised by petitioner, and we see no need to repeat their reasoning here. Finding no reversible error was committed by the trial court, we affirm the judgment.

ROSELLINI, STAFFORD, DIMMICK, and PEARSON, JJ., concur.

WILLIAMS, C.J. (concurring)—I concur in parts 2, 3, 4, and 5, and the result of the majority opinion.

DORE, J. (dissenting)—The major issue of the subject appeal is whether the jury was properly instructed on insanity and, if not, whether this constituted prejudicial error.

The majority, in affirming the trial court and the Court of Appeals, upholds the validity of instruction 10, instructing the jurors the defendant would be "insane" only if he couldn't distinguish between *legal* right and wrong. The majority eliminated the *moral* right and wrong test by concluding that "moral" wrong and "legal" wrong are synonymous.

I disagree, for I believe that although at times moral and legal are "synonymous," sometimes they are distinguishable. This is a factual issue to be determined by the trier of the fact, and not by the courts as a matter of law. The submission of instruction 10 constituted prejudicial error. I would reverse for a new trial based on the instruction's erroneous statement of the law on insanity.

The majority has correctly set forth the facts, but I would like to supplement them by adding some pertinent information. Dr. Nathan Kronenberg, the psychiatrist who testified Crenshaw was competent to stand trial, added that in examining Crenshaw he noted tangentiality, loose associations, delusions of grandeur, religiosity (including a belief in his possession of special powers), auditory hallucinations, lack of insight, and extreme emotional lability on the part of the defendant. He further testified that the defendant's ability to assist in his defense was distorted by his paranoia. Report of Proceedings, at 40–43. Dr. Kronenberg further related that the defendant's perception of right and wrong and his capacity to appreciate the consequences of his behavior were very likely distorted at the time of the offense. Report of Proceedings, at 50.

Dr. John Mahaffy, another psychiatrist who examined Crenshaw, concluded the defendant was suffering from a paranoid state, and was in remission from former psychotic episodes. Report of Proceedings, at 60. Although he testified Crenshaw was competent to stand trial, he qualified his

testimony with a statement that the defendant's legal sanity at the time of the offense would be suspect if the defendant at that time was suffering from a psychotic episode. Report of Proceedings, at 61. The defendant has a history of mental problems. He was hospitalized in his home state of Texas 15 times between 1970 and 1978, where he was diagnosed as a paranoid schizophrenic.

Washington's test for insanity, a codification of *M'Naghten*'s rule, reads:

To establish the defense of insanity, it must be shown that:

(1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:

(a) He was unable to perceive the nature and quality of the act with which he is charged; or

(b) He was unable to tell right from wrong with reference to the particular act charged.

(2) The defense of insanity must be established by a preponderance of the evidence.

RCW 9A.12.010.

The issue before us is whether the terms "right" and "wrong" as used in RCW 9A.12.010(1)(b) should be qualified for the jury. At trial, the jury was instructed the defendant would not be legally insane if he knew "legal right" from "legal wrong". Crenshaw contends the trial court erred in defining "right and wrong" as "legal right" and "legal wrong". The majority of the Court of Appeals held that

If the accused knew his act was wrong—either legally or morally—then he cannot be excused for his crime by the insanity defense.

(Footnote omitted.) *State v. Crenshaw*, 27 Wn. App. 326, 338–39, 617 P.2d 1041 (1980). The Court of Appeals concluded that the trial court did not err in its instruction on insanity because, if the defendant knew his conduct was contrary to law, he could not be found legally insane even if he could not distinguish moral right from moral wrong. The majority avoids the problem by holding that legal right and

moral right are "synonymous".

The defendant urges this court to define the terms solely as "moral right and wrong" or, alternatively, to leave the terms undefined for the jury, as does the pattern instruction.[3] The Court of Appeals argued that if the moral sense of the terms becomes the standard, the defense would be broadened significantly. Anyone would be able to argue that his actions were justifiable by reference to his personal morality. This court has held that the insanity defense is only intended to exculpate those persons who have completely lost contact with reality, such that the criminal law cannot affect their behavior. *State v. McDonald*, 89 Wn.2d 256, 571 P.2d 930 (1977).

The majority and the Court of Appeals miss the point. Of course, as they contend, the standard of right and wrong must be an objective one. That is not to say, however, that only the criminal code can provide that standard. I agree with the dissenting judge, Ringold, J., of the Court of Appeals, that if a defendant knows his acts are contrary to law, an inference may be drawn, *by a jury,* that defendant knew his acts were morally wrong.

> In limiting the definition of right and wrong to the legal sense the court imposed on the jury a mandatory inference that the defendant was not insane, thereby directing a verdict.

---

[3]The Court of Appeals majority, although enunciating the test set out above, also somewhat inconsistently stated:

> In most insanity cases, jury instructions need not distinguish between legal or moral wrong because the issue rarely arises. *M'Naghten* and our statutes clearly allow an open-ended instruction. Accordingly, the typical practice of submitting WPIC 20.01 to the jury without attempting to define "right" and "wrong" is appropriate.

*State v. Crenshaw,* 27 Wn. App. 326, 339, 617 P.2d 1041 (1980). It is particularly in insanity cases, however, that the problem may arise as to whether a defendant confused legal actions (*i.e.,* man's law) with moral actions (*i.e.,* God's law). Petitioner here suffered from such a conflict. I see no reason to establish an insanity test which would single out those defendants whose mental disease or defect has so disordered their minds that they operate under a moral code which conflicts with our legal code, while leaving to the jury the unqualified determination, in all other cases, of whether a defendant knows right from wrong.

*Crenshaw,* at 344.

I do not believe that a jury's function in this regard should be usurped. As used in RCW 9A.12.010(1)(b), the terms "right" and "wrong" refer to their moral sense, and not to a defendant's knowledge that he has acted contrary to the law.

It is not the mere assertion by a defendant that he "thought" he committed no moral wrong which would excuse his otherwise criminal act. The statute requires that such belief be the result of mental disease or defect and that such defect existed at the time of the commission of the offense. As Justice Cardozo stated in *People v. Schmidt,* 216 N.Y. 324, 340, 110 N.E. 945 (1915):

> It is not enough, to relieve from criminal liability, that the prisoner is morally depraved. It is not enough that he has views of right and wrong at variance with those that find expression in the law. The variance must have its origin in some disease of the mind. The anarchist is not at liberty to break the law because he reasons that all government is wrong. The devotee of a religious cult that enjoins polygamy or human sacrifice as a duty is not thereby relieved from responsibility before the law. In such cases the belief, however false according to our own standards, is not the product of disease. Cases will doubtless arise where criminals will take shelter behind a professed belief that their crime was ordained by God . . . We can safely leave such fabrications to the common sense of juries.

(Citations omitted.)

I also agree with Judge Ringold, who pointed out that

> if we are to be consistent in our application of the maxim that ignorance of the law excuses no man, then a person's knowledge of the law must be immaterial to culpability.

*Crenshaw,* at 343.

This court has previously indicated that the *M'Naghten* test involved the moral definition of right and wrong. Prior to codification of the *M'Naghten* rule into our statutory scheme, we held that a jury was correctly instructed when it was told that the insanity defense would lie if defendant "'was unable to perceive the *moral qualities*" of his act.

(Italics mine.) *State v. Davis,* 6 Wn.2d 696, 708, 108 P.2d 641 (1940). The sole question is whether we want to hold a defendant answerable to our criminal law, notwithstanding the barbaric or cruel nature of the defendant's acts. A mind which cannot distinguish moral right from wrong cannot be held accountable for acts performed as a result of that illness and while suffering under that influence.[4]

The majority, at page 798, surprisingly seems to concede that at times there is a difference between legal right and wrong and moral right and wrong, stating:

A narrow exception to the societal standard of moral wrong has been drawn for instances wherein a party performs a criminal act, knowing it is morally and legally wrong, but believing, because of a mental defect, that the act is ordained by God: such would be the situation with a mother who kills her infant child to whom she is devotedly attached, believing that God has spoken to her and decreed the act. *See People v. Schmidt,* [216 N.Y. 324, 110 N.E. 945 (1915)] at 339. Although the woman knows that the law and society condemn the act, it would be unrealistic to hold her responsible for the crime, since her free will has been subsumed by her belief in the deific decree. *People v. Schmidt, supra.*

This is exactly the point I wish to make in the subject case. Crenshaw knew if he killed his wife he was violating the

---

[4]Again, I turn to the words of Justice Cardozo: "We must not, however, exaggerate the rigor of the rule by giving the word 'wrong' a strained interpretation, at war with its broad and primary meaning, and least of all, if in so doing, we rob the rule of all relation to the mental health and true capacity of the criminal. The interpretation placed upon the statute by the trial judge may be tested by its consequences. A mother kills her infant child to whom she has been devotedly attached. She knows the nature and quality of the act; she knows that the law condemns it; but she is inspired by an insane delusion that God has appeared to her and ordained the sacrifice. It seems a mockery to say that, within the meaning of the statute, she knows that the act is wrong. If the definition propounded by the trial judge is right, it would be the duty of a jury to hold her responsible for the crime. We find nothing either in the history of the [*M'Naghten*] rule, or in its reason and purpose, or in judicial exposition of its meaning, to justify a conclusion so abhorrent. No jury would be likely to find a defendant responsible in such a case, whatever a judge might tell them. But we cannot bring ourselves to believe that in declining to yield to such a construction of the statute, they would violate the law." *People v. Schmidt,* 216 N.Y. 324, 339, 110 N.E. 945 (1915).

law, but he believed he had a duty to do it under the teaching of his Moscovite "religious" beliefs. To determine his insanity under *M'Naghten,* as codified in RCW 9A.12-.010, a determination must be made as to what was morally right and wrong. The jury had this duty and responsibility, but to do so it had to be properly instructed. Instruction 10 wrongly limited the jury to the *legal* right and wrong test and prevented it from determining whether Crenshaw knew the difference between *moral* right and wrong at the time he killed his wife. This constituted prejudicial error.

The majority concludes at page 805, "Thus, we hold *prospectively* that as a general rule no definition of wrong should accompany an insanity defense instruction" (italics mine), impliedly admitting and agreeing that instruction 10 is defective and that the jury should be instructed under *both moral* and *legal* wrong in order to correctly determine insanity. Without saying so, the majority adopts WPIC 20.01 as a correct instruction on insanity. Crenshaw argued use of WPIC 20.01 would have permitted his lawyers to argue moral right and wrong as the true test of insanity in his case, and that his jury should have been so instructed. The majority holds that future defendants shall have the benefit of WPIC 20.01, but not defendant Crenshaw.

I would reverse and remand to the trial court for a new trial on the basis that instruction 10 was defective and constituted prejudicial error.

UTTER and DOLLIVER, JJ., concur with DORE, J.

Reconsideration denied March 30, 1983.