IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  38785-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| EDUARDO IBARRA VALENCIA, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — After a bench trial, the superior court adjudged Eduardo Ibarra

Valencia guilty of one count of first degree murder and one count of first degree

attempted murder.  On appeal, he assigns error to the superior court's rejection of his

insanity defense.  He insists he proved by a preponderance of evidence that he could not

tell right from wrong when he committed the crimes.  Because a reasonable trier of fact

could have concluded that Valencia knew right from wrong or at least knew that his

shootings were illegal, we affirm the two convictions.

FACTS

Eduardo Ibarra Valencia concedes he killed one man and tried to kill another man

at his place of employment on November 20, 2015.  The appeal centers around

Valencia's defense of insanity. We refer to the appellant with the surname of Valencia, his chosen last name in his brief.

Eduardo Ibarra Valencia struggled with anxiety, depression, and paranoia. He often believed his girlfriend, Alma Mireles, and their three children were in danger of being murdered or abducted. After learning about his brother's murder in 2013 in Mexico, Valencia's anxiety, depression, and paranoia worsened, and his belief of danger intensified.

Eduardo Valencia worked as a welder at Callahan Manufacturing in Royal City. He thought the Michoacan cartel murdered his brother and believed his coworkers at Callahan Manufacturing, because of a purported connection to the cartel, threatened his safety.

In February 2015, Eduardo Ibarra Valencia hung a rope from the roof of his home's garage for the purpose of hanging himself. Alma Mireles successfully talked him out of his plan by reminding him that the couple enjoyed a wonderful life with their three children. The next day, Valencia exhibited strange behavior, which caused Mireles to call the police. Valencia underwent a mental health evaluation at the Quincy Medical Clinic. A physician at the clinic prescribed him medications. Valencia ceased taking the medications in August 2015, due to a belief that they did not help.

Beginning in July 2015, Eduardo Ibarra Valencia's coworkers at Callahan Manufacturing noticed a deterioration in his behavior. Valencia, previously a friend to

coworkers, was now "distant," "angry," "acting crazy," and "always upset." Report of

Proceedings (RP) at 465, 482, 690, 750. He daily threatened and yelled at coworkers.

One time, when a few of his coworkers conversed, he snapped and told them to cease

speaking about him or else he would "beat the shit out of [them]." RP at 483. He told

coworker Agustin Verduzco:

> You're an ungrateful old man because I helped you get work here
> and now you're talking about me. Why don't you tell me to my face what
> you want to say?

RP at 464. Valencia's behavior frightened his coworkers. Valencia often complained

about problems he was having with his coworkers to Alma Mireles, but did not identify

reasons for these problems.

In October 2015, Alma Mireles discovered a disassembled semi-automatic pistol

in one of Eduardo Ibarra Valencia's dresser drawers. She wrapped the gun in a shirt to

conceal it from their children. When she asked Valencia his reason for having the

firearm, he replied that he acquired it to protect their family because of the many others

wishing to harm them. In the middle of November 2015, Valencia showed the gun to

Miguel Abarca, a coworker with whom he had a friendship, but did not inform him of his

reason for purchasing it.

On November 19, 2015, Eduardo Ibarra Valencia approached coworkers Gustavo

Lopez and Agustin Verduzco at work. He asked Lopez why they laughed at him. Lopez

3

denied that the two laughed at Valencia and explained that the two lacked any ill will toward Valencia.

According to Alma Mireles, Eduardo Ibarra Valencia's paranoia increased to an extreme level on November 19. During that evening, Valencia told Christopher, the couple's oldest child, that "no matter what, he loves [Christopher and his] three siblings so much and that [they] mean the world to him." RP at 343. Valencia further told Christopher to care for his siblings and help his mother. Valencia drank coffee all night and slept at most two hours.

Around 5:00 on the morning of November 20, 2015, Eduardo Ibarra Valencia asked Alma Mireles for his gun. He did not volunteer his reason for desiring the gun. Mireles complied and gave him the disassembled gun. Valencia showered, dressed, and went to work. Valencia returned home around 7:00 a.m. and requested to speak with the children. Mireles denied his request because Valencia looked like he had been crying. She left the room they were in to grab a sweater for one of the children, and, when she returned, Valencia was gone from the home.

Eduardo Ibarra Valencia returned to work but did not punch the time clock. When coworker Frederico Rodriguez (Frederico) arrived at work, Valencia approached his truck, insulted him, showed him the pistol, and said "I got something here to kill all you fuckers." RP at 725. Valencia declared that he "had enough there for all of [them]." RP at 730. Irvin Dean Callahan, the owner of Callahan Manufacturing, arrived to work and

4

saw Frederico, Frederico's brother Joel Rodriguez (Joel), and Valencia conversing outside. Joel also worked at Callahan Manufacturing. Frederico waved Callahan over to join the conversation and reported to Callahan that Valencia possessed a pistol and had threatened Frederico. Valencia three times told Frederico and Joel to "'[t]ell the truth.'" Valencia grew more agitated each time he repeated the words. RP 350. Because much of the conversation was in Spanish, Callahan told the men to separate, and he walked to an adjacent car wash to retrieve his bi-lingual son-in-law, Paul, to translate.

After distancing himself from Eduardo Ibarra Valencia, Frederico Rodriguez asked coworker Juan Silva to take him to city hall to report Valencia's threats. As Silva and Frederico left, Valencia walked toward them. Valencia suddenly changed course, walked away from Silva and Frederico, and proceeded toward the shop wherein Joel Rodriguez had entered. When Valencia located Joel, he, from behind a truck, repeatedly shot at Joel until Joel fell to the ground by the truck. After shooting Joel, Valencia walked to Joel's side of the truck and shot toward coworker Agustin Verduzco. Verduzco ran from Valencia, who chased him, shot at him at least twice, and yelled "'[n]ow you too.'" RP at 456. More than one bullet struck Verduzco. After shooting Joel and Verduzco, Valencia stowed the gun in his jacket pocket and left the shop.

One hour after committing the shootings, Eduardo Ibarra Valencia returned home. He told Alma Mireles to call the police because he "messed up" and had killed someone.

5

RP at 292.  Mireles removed their daughter from the house and returned to hear Valencia

on the phone with law enforcement.  Valencia also pled with Mireles:

> Tell the children that I love them very much. . . .  Because I had no
> choice.  They wouldn't leave me alone.
> . . . Because, dear, they wouldn't leave me alone, everything I told
> you is true, it's true, it's true, I swear to you, it's true, and everything I'm
> telling, all of it happened, it's true, it's not a lie.

RP at 889.

Agustin Verduzco was treated for the multiple gunshot wounds and underwent

life-saving surgery.  Joel Rodriguez died immediately from gun wounds.

PROCEDURE

The State of Washington charged Eduardo Ibarra Valencia with one count of first

degree premeditated murder with a deadly weapon and one count of attempted first

degree premeditated murder with a deadly weapon.

Eduardo Ibarra Valencia hired forensic neuropsychologist Kenneth Muscatel to

assist in his defense.  Dr. Muscatel examined Valencia twice in 2016.  Through these

examinations, Muscatel concluded that Valencia suffered from acute paranoia, a mood

disorder, and a delusional disorder.  Valencia saw threats where there were no threats.

According to Muscatel, Valencia believed that his coworkers sought to kill him and his

family.

During a bench trial, Dr. Kenneth Muscatel testified to the description of events

shared with him by Eduardo Ibarra Valencia:

6

A. Well, it goes back a ways. So he felt that he was—other people were—there were threats being made to him by people at work. You have to go back and his brother had been killed in *Michoacan*, and this seemed to cause a change in his thinking and behavior.

Q. Why do you say that?

A. Well, because he described that he started to feel like people—felt like he was being watched and monitored. It seems to have been dated in time largely to his brother's death. This is just information that he provided to me and a sense that I got. But he felt like there were people in this area that were connected to folks in *Michoacan*. He specifically related to the cartel, the drug cartel where he came from, and that this was connected with his brother's death, and this is also somehow connected with people up here.

Q. Did he describe feelings of paranoia to you? I mean you touched on it before, but I didn't quite ask you in that way. And paranoia from his co-workers?

A. He felt threatened and he seemingly would impute potentially violent motives to statements that might otherwise seem fairly innocent or innocuous, like he's going to be gone as opposed to I'm going to kill this guy, a direct threat. So this is an invocation, but this is what he described to me.

Q. Did he tell you that he felt that those threats arose to a level where he thought that others would kill him?

A. He expressed feeling very threatened and that when they made those threats, they meant that they were going to kill him. That's what he communicated to me.

. . . .

Q. Now, I want you to assume—we're here on the second week of trial—that there has been testimony that there have been no threats to him or made to him in a manner that would suggest any harm.

A. That's a question or—

Q. Well, yes, I'd like you to assume that for the purposes of this question.

A. Okay.

Q. If that is such the case, how does—does that affect your opinion with respect to his paranoia?

A. Yeah. Paranoia is misperceiving or misreading or mis-appreciating stimuli in the environment. So you see threat where there's no threat. That is what the definition of what paranoia is. It rises to a more

7

fixed set of beliefs, that of a threatening nature, sometimes not threatening, but usually threatening, that's a delusional system, that's a fixed set of beliefs that are not in touch with reality, but the person believes them.

That is the part of a delusional disorder, it's also part of an acute paranoid state. And so the key is are these beliefs based in reality? I mean this is as the old joke goes, just because you're paranoid doesn't mean they're not out to hurt you. Okay?

So you have to determine, first, was there any threatening behavior, was there any harm done, was there anything that a rational person would understand and accept as threatening behavior? And the answer is no, then that raises the hypothesis that it's paranoia at work.

Q. And in this case you have reviewed a number of interviews from individuals that were co-workers, correct?

A. Correct. And those interviews were provided after I authored my report and my two addendums.

Q. Right. And in your review of those reports, did anybody indicate from Callahan Manufacturing, Joel Rodriguez, Agustin Verduzco, Gustavo, was there anybody that said Mr. Ibarra Valencia was being threatened in a manner which he relayed to you?

A. No, not at all. He described feeling like he was being bullied and that people were making threats to him, that he's fearful. He described very specific things being done to him that were unwarranted, but also somehow connected to his brother's death, in his mind. And this is what he described to me as being believed, would be believed by him and motivating his behavior, and none of these other records indicate any such behavior was being done to him.

Q. Do you have an opinion based off of the information that you reviewed whether Mr. Ibarra Valencia's perceptions of threats from his co-workers were delusional or not?

A. They were certainly paranoia and potentially delusional; that is, that he would hear things and interpret statements and looks and gestures that were derisive—he was feeling bad, this is all, by the way, the rational and irrational are not necessarily separate. So things can be mixed together. So he believed that he was—they are discounting him. He also believed that people were making more money than he was and he was working harder than them.

Q. But you would agree that at least his perceptions, based off the information that you've reviewed, his perceptions of the threats themselves, those were delusional in nature?

A. Yes, I would agree with that.

. . . .

Q. All right. We'll get to your diagnosis in a bit. We'll talk about that some more. But did you ask him why he brought the gun to work or why he brought a gun to work?

A. He said that he felt threatened, but also that he felt safer with a gun. So my understanding, that was the implication. But he also had maybe some expectation that things were going to go badly.

. . . .

A. . . . He said that he took the gun to work because they said—because they said that they were going to kill him or wanted to kill him. He said that they were always bragging that they had weapons and one guy even had a permit for a weapon. This is stuff that he said to me specifically. And that the individual had a weapon, one individual had a weapon in his car, and always talking about fire power. In other words, he was describing this, the work environment, as a threatening environment, is what he said to me.

Q. Did he indicate to you that on November 20th, 2015, he was perceiving those same types of threats from co-workers?

A. Yeah.

Q. And if you could explain that to the court, because we're getting a little bit more fact specific here.

A. The level of threats that he was describing [to] me were ongoing. They didn't seem to ebb and flow. I'm not a witness to it, but this is what he described to me.

Q. Okay. Now, the victim in this case—the deceased in this case is Joel Rodriguez.

A. Yes.

Q. And one of the victims of the shooting is Agustin Verduzco.

A. Yes.

Q. Did you inquire of him and did he explain to you specific paranoia with respect to Joel Rodriguez or Agustin Verduzco?

A. He talked about feeling threatened by the people in general. He didn't name so and so did this and so and so did that. Again, you may be referring to something—I didn't put the names in my report.

Q. Right.

. . . .

Q. . . . Did he explain to you what caused him to begin shooting that day? And if you would like—

9

. . . .

A. Yeah, we talked—you know, I asked him that. Yeah, he did say that he shot the individual because they were threatening him and he was saying, here I am, come for me. Again, he said they were afraid of him because they realized he was no longer afraid of them in terms of like I'm not going to be bullied, that was my interpretation.

Q. Was there anything to suggest that in your interview with Mr. Ibarra Valencia that his shooting, the act of shooting began spontaneously for him?

A. Yeah, he did actually call it all of a sudden he got very upset and everything, all the bullying and all the abuse came up for him, and that's when he started to pull out the gun and started shooting.

Q. All right. So from a psychological standpoint, how do you interpret that?

A. His, it was an impulsive act by his description. In other words, he's saying, I didn't bring the gun, that I had a plan in mind, but rather that he pulled the gun out when he got— all of a sudden he got upset by all of the history of abuse and acted impulsively, that's what it suggested.

RP at 807-16.

During trial, Dr. Kenneth Muscatel relayed that Eduardo Ibarra Valencia explained to him that he did not report the alleged workplace threats and bullying to his boss or to police because "he was not a snitch." RP at 848.

During trial testimony, neuropsychologist Kenneth Muscatel explained the relationship between Eduardo Ibarra Valencia's mood and delusional disorders and the shootings of Agustin Verduzco and Joel Rodriguez:

Q. Right. So on a more probable than not basis, do you believe that Mr. Ibarra Valencia's delusional disorder affected his ability to appreciate wrong from right on the day of the shooting on November 20—November 20th, 2015?

A. Yeah, I do. But this was a very difficult—this was a very difficult determination.

10

Q. Well, why do you say that you do believe that it did affect his ability to appreciate right from wrong?

A. Because he felt—he apparently believed that he was not only being harassed and being ridiculed and being treated badly by his co-workers, but that they were—they represented a threat to his life, and perhaps to his family, as well. And therefore, he acted based upon that belief.

Now, I also say in my report, he did not indicate that there was an imminent threat. In other words, that he saw no weapon, he saw no imminent threat to him at that time. That's why I struggled so much with this.

. . . .

A. But it's still very difficult. He didn't believe that these individuals presented an immediate risk to him, but more of a generalized risk. And that's what I've been struggling with. And that's why it took—I had three or four iterations on this record to try and hone my findings.

Q. Yes.

Do you believe at the time of the shooting there is evidence in the records that you have reviewed to suggest that he was psychotic at the time of the shooting?

A. That he was in the midst of a delusional disorder?

Yes.

RP at 821-23.

The trial court asked Dr. Kenneth Muscatel to address Eduardo Ibarra Valencia's

ability to distinguish between right and wrong on the day of the shootings. Muscatel

responded:

[Ibarra Valencia] knew that [shooting his coworkers] was not legal, first off. That's very clear. In fact, I think he calls 911. He understood that.

RP at 827.

11

The State called no expert to contradict the testimony of Kenneth Muscatel. The trial court concluded, in a written opinion, that Eduardo Ibarra Valencia:

> was able to tell right from wrong regarding his acts of shooting Joel and Agustin. Even though his paranoid and delusional beliefs convinced him his coworkers were a threat, he knew the threat was not imminent.

Clerk's Papers (CP) at 241. The trial court also concluded that Valencia:

> knew shooting his coworkers was wrong and would have legal consequences. He knew shooting them would cause him to be separated from his family and that he would be arrested and put in jail.

CP at 241.

## LAW AND ANALYSIS

Eduardo Ibarra Valencia assigns error solely to the trial court's rejection of his insanity defense. He contends the trial court ignored overwhelming evidence of insanity. He argues that the evidence he submitted at trial contradicts the trial court's finding that he "knew shooting his coworkers was wrong and would have legal consequences" when he committed the crimes. CP at 241. He emphasizes that the State failed to present any expert testimony rebutting the opinions of Dr. Kenneth Muscatel.

When reviewing the sufficiency of the evidence when a defendant bears the burden of proving an affirmative defense by a preponderance of the evidence, we assess whether, considering the evidence in the light most favorable to the State, a rational trier of fact could have found that the defendant failed to prove the defense by a preponderance of the evidence. *State v. Lively*, 130 Wn.2d 1, 17, 921 P.2d 1035 (1996).

Whether the evidence is credible and whether it amounts to proof by a preponderance lies with the trier of fact. *State v. Arbogast*, 199 Wn.2d 356, 372, 506 P.3d 1238 (2022). The trier of fact, not the appellate court, weighs the evidence. *State v. Crossguns*, 199 Wn.2d 282, 297, 505 P.3d 529 (2022).

Washington recognizes a presumption that a defendant is sane. *State v. Matthews*, 132 Wn. App. 936, 938, 135 P.3d 495 (2006). Nevertheless, the law does not wish to punish someone whose loss of reality places him beyond the influence of the criminal law. *State v. White*, 60 Wn.2d 551, 590, 374 P.2d 942 (1962).

"Insanity is a defense which the defendant must establish by a preponderance of the evidence." RCW 10.77.030(2); *See* RCW 9A.12.010(2). Insanity is a defense that completely absolves a defendant of criminal liability. *State v. Crenshaw*, 98 Wn.2d 789, 793, 659 P.2d 488 (1983).

To demonstrate insanity, the M'Naghten test, codified at RCW 9A.12.010, provides that a defendant must show the following:

> [a]t the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:
> (a) He or she was unable to perceive the nature and quality of the act with which he or she is charged; or
> (b) He or she was unable to tell right from wrong with reference to the particular act charged.

RCW 9A.12.010(1); *State v. Wheaton*, 121 Wn.2d 347, 354, 850 P.2d 507 (1993).

13

Under the M'Naghten test, an individual is unable to tell right from wrong with reference to the particular act charged, if, at the time of commission of the offense, he is unable to tell that his act is one which he "ought not to do." *State v. Crenshaw*, 27 Wn. App. 326, 338, 617 P.2d 1041 (1980), *aff'd*, 98 Wn.2d 789, 659 P.2d 288 (1983); *M'Naghten's Case*, 10 Clark & Fin. 200, 210, 8 Eng. Rep. 718, 722 (H.L. 1843). The accused cannot be excused, under the insanity defense, if he or she knew his or her act was either legally or morally wrong. *State v. Crenshaw*, 27 Wn. App. 326, 338-39 (1980).

Dr. Kenneth Muscatel determined Eduardo Ibarra Valencia suffered from a mood disorder and a delusional disorder. Muscatel opined that Valencia was delusional at the time of the shooting and thereby unable to distinguish between right and wrong. Still Muscatel conceded that Valencia did not consider his coworkers an immediate threat to his life or to his family members' lives. More importantly, he admitted difficulty in reaching his opinion.

The superior court was not bound by the opinion of Kenneth Muscatel. The weight to be given an expert's conclusion is left to the trier of fact. *State v. Lord*, 117 Wn.2d 829, 854, 822 P.2d 177 (1991), *abrogated on other grounds by State v. Schierman*, 192 Wn.2d 577, 438 P.3d 1063 (2018). An expert's opinion on a defendant's sanity is not dispositive. *State v. Mitchell*, 102 Wn. App. 21, 27, 997 P.2d 373 (2000).

The State presented sufficient evidence to refute Dr. Kenneth Muscatel's opinion that Eduardo Ibarra Valencia could not distinguish between right and wrong at the time he committed the crimes. Muscatel averred that Valencia told him that Valencia addressed the threats and workplace bullying himself instead of reporting it to his boss or to law enforcement because "he was not a snitch." RP at 848. Alma Mirales testified that Valencia requested to speak to their children before the shooting, told her to call the police because he killed someone when he arrived home after the shooting, and eventually called 911 himself. The State also elicited testimony from Christopher, who declared that his father told him "no matter what, he loves [Christopher and his] three siblings so much and that [they] mean the world to him" the day before the shootings. RP at 343. All of this testimony confirmed that Valencia knew right from wrong at the time of the shootings.

Just as important, trial testimony showed that Eduardo Ibarra Valencia knew he engaged in legally wrong conduct. In response to questioning from the court, Dr. Kenneth Muscatel responded that "[Ibarra Valencia] knew that [shooting his coworkers] was not legal, first off. That's very clear." RP at 827.

Eduardo Ibarra Valencia argues that the trial court wrongly concluded that he needed to deem his coworkers an imminent threat in order to qualify for the insanity defense. We agree with Valencia that a belief in an imminent threat lacks relevance to the question of insanity. Imminence is a factor to be considered when analyzing the

15

affirmative defense of self-defense, but imminence is typically not considered when analyzing the sufficiency of an insanity defense. *State v. Kelly*, 102 Wn.2d 188, 198, 685 P.2d 564 (1984). Nevertheless, the trial court never ruled that an immediate threat was essential to its finding. Instead, the trial court mentioned the lack of an immediate threat to address Valencia's argument that he believed a threat to him and his family was imminent.

## CONCLUSION

We affirm Eduardo Ibarra Valencia's convictions.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____
Pennell, J.

_____
Staab, J.

16