[No. 60197-1-I.   Division One.   June 8, 2009.]

THE STATE OF WASHINGTON, *Respondent*, v. GEORGE ALVIN JOHNSON, JR., *Appellant*.

664

666

*Christopher Gibson* (of *Nielsen, Broman & Koch, PLLC*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Andrea R. Vitalich, Deputy*, for respondent.

¶1 ELLINGTON, J. — Despite claims of insanity and/or diminished capacity, George Johnson, Jr., was convicted of three counts of bank robbery. He contends the trial court improperly limited expert testimony concerning his defenses and improperly instructed the jury about diminished capacity. Johnson also appeals his sentence, arguing that certain prior convictions should not have counted as "strikes" under the Persistent Offender Accountability Act (POAA) of the Sentencing Reform Act of 1981, chapter 9.94A RCW; that the State should have been required to prove his prior convictions to the jury beyond a reasonable doubt; and that his sentence to life without parole constitutes unconstitutionally cruel punishment. We reject each of these arguments and affirm.

## BACKGROUND

¶2 George Johnson robbed three Seattle banks in October 2004. In each case, Johnson entered the bank wearing

a distinctive baseball cap, wrote a demand on a deposit slip at the bank kiosk, waited in line, and presented the note to a bank teller.[1] In each case, the teller did as she was instructed and Johnson took the money and the note and left the bank.

¶3 Johnson was arrested after an officer noticed him wearing the same distinctive baseball cap in downtown Seattle. Detectives investigating robberies on October 8 and October 14 interrogated him about those crimes. Johnson was cooperative, confessed to both robberies, and told the detectives he had also committed a robbery on October 6. Johnson explained that he stole the money to support a cocaine habit and to give money to a friend who had cancer.

¶4 The State charged Johnson with three counts of first degree robbery of a financial institution. Johnson pleaded both "not guilty" and "not guilty by reason of insanity." Johnson did not significantly contest the State's version of events but presented expert testimony regarding the insanity defense and his ability to form intent.

¶5 The defense offered two experts, Douglas Whiteside and Fred Bookstein. Whiteside is a neuropsychologist who performed two days of testing to assess Johnson's brain function. Johnson has an IQ (intelligence quotient) of 75, putting him in the "borderline impaired range."[2] Results of other tests indicated significant deficits in executive functioning, which make it difficult for Johnson to solve problems, inhibit automatic behavior, or encode new information.

¶6 Whiteside diagnosed Johnson with borderline cognitive functioning secondary to fetal alcohol effects and

---

[1] In the October 6 robbery of Washington Federal Bank, the note said, "[D]on't make me kill you. Give me $500." Report of Proceedings (RP) (Jan. 24, 2007) at 26. In the October 8 robbery of a Wells Fargo bank, the demand note stated, "Give me all the hundred dollars or I will kill you." *Id.* at 153. In the October 14 robbery of Watermark Credit Union, Johnson's note instructed, "[C]ount out $1,500 or you'll die." RP (Jan. 29, 2007) at 67.

[2] RP (Jan. 29, 2007) at 176.

posttraumatic stress disorder. Whiteside testified these conditions rendered Johnson unable to perceive the nature and quality of his actions during the robberies or to understand that what he was doing was wrong. Whiteside also concluded that Johnson could not form the intent to steal.

¶7 Bookstein is an expert on fetal alcohol spectrum disorders (FASD). He examined magnetic resonance images of Johnson's brain and confirmed severe FASD-related brain damage. Bookstein described in detail how such damage affects executive functioning abilities. Upon the State's objection, Bookstein was precluded from testifying that FASD impairs the ability to tell right from wrong and from giving two anecdotes to illustrate his testimony. Because he had never examined Johnson in person, Bookstein was also prevented from giving an opinion about Johnson in particular.

¶8 Psychologist Lori Thiemann evaluated Johnson during a 30 day commitment at Western State Hospital. She testified as an expert for the State. Unlike Whiteside and Bookstein, Thiemann interviewed Johnson about his conduct at and around the time of the robberies. Though she accepted Whiteside's FASD diagnosis and did not dispute the testimony about FASD, Thiemann observed no cognitive impairment or posttraumatic stress disorder and found no evidence that Johnson lacked the ability to perceive the nature and quality of his actions, was unable to tell right from wrong, or lacked the capacity to form intent. Thiemann's opinion was based, in part, on her observations that Johnson had a rational goal; was able to take logical, sequential, and effective steps to achieve that goal; and appreciated the risk of capture. Thiemann also found it significant that when police approached Johnson, he understood they would be interested in either the bank robberies or his drug dealing, and was able to make a rational statement to police.

¶9 The court instructed the jury on the defenses of insanity and diminished capacity. The jury convicted Johnson as charged.

¶10 After the verdict, the defense moved to arrest judgment based on the limitations on Bookstein's testimony and the instruction on diminished capacity. The court denied the motion.

¶11 At sentencing, the State produced evidence of two prior Oregon robbery convictions as predicate crimes for sentencing under the POAA. The court found both to be strike crimes and sentenced Johnson to life imprisonment without the possibility of parole.

## DISCUSSION

### *Jury Instruction*

¶12 Johnson first contends the court erred by giving an incorrect jury instruction on diminished capacity. We review this question de novo.[3]

¶13 The diminished capacity defense "allows a defendant to undermine a specific element of the offense, a culpable mental state," by showing that a mental disorder rendered him "incapable of having the required level of culpability."[4] The court gave a variation of the standard pattern instruction:

> Evidence of a mental disease, disorder or defect may be taken into consideration in determining whether the defendant had the capacity to form the intent to commit theft.[5]

¶14 Johnson contends this instruction relieved the State of its burden to prove actual intent because it allowed the jury to consider evidence of Johnson's mental condition only if it found the condition rendered him completely incapable of forming the requisite intent. He argues the jury should have been permitted to consider the evidence as relevant to whether he actually had intent to steal without first having

---

[3] *State v. Stevens*, 158 Wn.2d 304, 308, 143 P.3d 817 (2006).

[4] *State v. Gough*, 53 Wn. App. 619, 622, 768 P.2d 1028 (1989).

[5] Clerk's Papers at 159.

to find his condition left him without the capacity to form intent. He proposed the following instruction:

> Evidence of mental illness or disorder may be taken into consideration in determining whether a mental disorder, disease, or defect impaired the defendant's capacity to form the intent to commit the crime of theft.[6]

¶15 Johnson's argument relies on statements in *State v. Atsbeha*[7] and *State v. Ellis*.[8] In both cases, our Supreme Court stated that "[t]o maintain a diminished capacity defense, a defendant must produce expert testimony demonstrating that a mental disorder, not amounting to insanity, impaired the defendant's ability to form the culpable mental state to commit the crime charged."[9] Johnson contends that this gloss represents a dramatic shift in the law, and that the question in diminished capacity cases is no longer whether the defendant had capacity to form intent, but whether that capacity was impaired.[10]

¶16 This is a convoluted and illogical argument. There is no meaningful difference between the two instructions (whether the defendant had the capacity to form intent versus whether the defendant had an impaired capacity to form intent) unless the State is required to prove the defendant had a normal capacity to form intent. This is not the law. The State must prove actual intent. The defendant is entitled to present evidence that he had a mental disorder that interfered with his ability to form intent. The rest is up to the jury.

---

[6] *Id.* at 313 (defendant's proposed instruction 6C); *see also id.* at 312 (defendant's proposed instruction 6B, using "ability" in the place of "capacity").

[7] 142 Wn.2d 904, 16 P.3d 626 (2001).

[8] 136 Wn.2d 498, 963 P.2d 843 (1998).

[9] *Atsbeha*, 142 Wn.2d at 914; *Ellis*, 136 Wn.2d at 522 (using the phrase "specific intent" rather than "culpable mental state").

[10] *See* Appellant's Reply Br. at 3 ("These cases indicate the question a court must ask before admitting evidence of *or instructing the jury on* diminished capacity is not whether the defendant was capable of forming intent, but rather whether his ability to form intent was impaired." (emphasis added and omitted) (citing *Atsbeha*, 142 Wn.2d at 914; *Ellis*, 136 Wn.2d at 521)).

¶17 We find nothing in *Ellis* or *Atsbeha* to support Johnson's proposed analysis. First, neither *Ellis* nor *Atsbeha* addresses this question. Both cases consider what showing a defendant must make in order to advance a diminished capacity defense in the first place—to wit, evidence that his or her ability to form the requisite intent was impaired by a mental disorder. Both cases involved excluded expert testimony, and both reversed for a new trial, rejecting a rigid application of the so-called *Edmon*[11] factors (for determining admissibility of diminished capacity evidence) in favor of a traditional analysis under Evidence Rule 702.[12] *Ellis* and *Atsbeha* hold that expert testimony should be admitted if it tends to show that a mental disorder impaired the defendant's capacity to form the required intent.

¶18 Neither case purported to change the nature of the defense or the State's burden of proof. Johnson argues the rejection of the *Edmon* test for admission of evidence is also a rejection of the longstanding definition of the defense, so that the test for admissibility of evidence is also the test for diminished capacity. Neither *Ellis* nor *Atsbeha* addressed jury instructions, however, and unsurprisingly, nothing in either opinion indicates the court intended to modify the defense itself.

¶19 Under Johnson's formulation, an impaired capacity to form intent is the same as absence of intent. This is plainly illogical. Intent may exist even where capacity is impaired. The State must prove actual intent, not capacity. The only question was whether Johnson actually had the intent to steal at the time of the robberies. The jury was properly instructed that the State must prove beyond a reasonable doubt that he did, and that evidence of Johnson's mental disorder could be considered in that evaluation. The instruction did not limit the jury's consideration of that evidence.

---

[11] *State v. Edmon*, 28 Wn. App. 98, 621 P.2d 1310 (1981).

[12] *Id.* at 102-04.

¶20 Jury instructions are adequate if they are supported by the evidence, properly state the law, do not mislead the jury, and allow the parties to argue their theories of the case.[13] The court's instruction allowed the jury to consider and Johnson to argue that the State failed to prove intent. There was no error.

*Expert Testimony*

¶21 Johnson next contends the court abused its discretion by limiting Bookstein's testimony. Admissibility of evidence is within the sound discretion of the trial court.[14] "This court will not reverse a trial court's decision absent an abuse of discretion, which 'occurs only when no reasonable person would take the view adopted by the trial court.' "[15] We find no abuse here.

¶22 Bookstein had stated he had expertise in impairment of moral reasoning in FASD patients. He was asked whether FASD impairs the ability to tell right from wrong. Upon the State's objection, the court excused the jury, and extensive colloquy followed. In an offer of proof, Bookstein testified that

> moral reasoning is . . . the aspect of a person's reasoning that involves in thinking through what is right to do in a particular situation. . . . The issue is always one of conflicting norms. The issue is one of a moral dilemma. Wanting to achieve one worthy goal, and also wanting to achieve another worthy goal, and the role of executive functioning in general is to make one's way through this kind of conflict.[16]

In response to a question from the court, Bookstein agreed that FASD affects different people in various ways and to varying degrees, that some people with FASD may have

---

[13] *Stevens*, 158 Wn.2d at 308.

[14] *Atsbeha*, 142 Wn.2d at 913.

[15] *Id.* at 913-14 (internal quotation marks omitted) (quoting *Ellis*, 136 Wn.2d at 504).

[16] RP (Jan. 31, 2007) at 131.

more difficulty with moral reasoning than do others, and that Bookstein had no personal knowledge of how Johnson was affected.

¶23 The court sustained the objection because the testimony touched upon the legal concept of insanity with no foundation for using the legal terms. The court instructed counsel to proceed in a different direction, commenting that "questions on moral reasoning may be okay depending on kind of where we end up with it . . . . [C]ertainly the process is, you know, how the thinking of someone with FASD is affected is relevant."[17] Bookstein then testified before the jury that in his discipline, "[m]oral reasoning in that sense is a way of applying executive function to the kinds of questions that typically arise for people in a society where they have to decide what is right to do in a particular setting,"[18] and that this ability is affected by FASD. He described at length the means by which his profession measures moral reasoning ability. There was no objection to this evidence.

¶24 Later Bookstein stated that people with FASD have an impairment in reasoning about "[t]he right thing to do in a situation with competing equally worthy looking goals."[19] The court disallowed the testimony because it represented a return to the subject of moral reasoning in the legal context.

¶25 These rulings were not error. The defense failed to connect Bookstein's general knowledge about FASD-impaired moral reasoning to Johnson's ability to tell right from wrong at the time of the robberies. Bookstein's testimony that people with FASD are less able to decide "[t]he right thing to do in a situation with competing equally worthy looking goals"[20] was not relevant because,

---

[17] *Id.* at 143-44.

[18] *Id.* at 144-45.

[19] *Id.* at 154.

[20] *Id.*

as the trial court noted, "this is not a case about which [of] two worthy goals Mr. Johnson should be choosing."[21] There was no evidence that Johnson faced any dilemma. Bookstein's general testimony about FASD and the ability to tell right from wrong was also not relevant because in an insanity case, "it is society's morals, and not the individual's morals, that are the standard for judging moral wrong."[22] Bookstein's testimony presented a significant risk of misleading the jury about the legal standard for insanity. Further, Bookstein's general testimony would have been duplicative. Whiteside testified on exactly these questions in legal terms, and gave his opinion that Johnson did not know right from wrong and lacked the capacity to form the intent to commit robbery.

¶26 Johnson also contends the court erred by preventing Bookstein from offering opinions about Johnson in particular. Specifically, Johnson complains that Bookstein should have been permitted to testify that Johnson's condition was "a severe one,"[23] that "Johnson seems to have had specific difficulties in telling right from wrong in the context of the bank robberies,"[24] and that "Johnson would have great difficulty in forming the specific intent to commit a robbery."[25] Bookstein never met Johnson, however, and testified in his offer of proof he had no knowledge how Johnson was affected by his FASD. Further, two of Johnson's attorneys specifically told the court Bookstein would not offer such opinions.[26] The court did not abuse its

---

[21] *Id.* at 158.

[22] *State v. Crenshaw*, 98 Wn.2d 789, 797, 659 P.2d 488 (1983).

[23] Clerk's Papers at 304.

[24] *Id.* at 306.

[25] *Id.* at 307.

[26] In a pretrial discussion, attorney Virginia Faller represented that Bookstein's testimony was purely foundational and Bookstein would not offer medical or legal opinions about diminished capacity. During trial, attorney Tahl Tyson said Bookstein's testimony would be about "the science of [fetal alcohol syndrome,] [h]ow it works, and why it affects people the way it does." RP (Jan. 31, 2007) at 7. Tyson represented that Bookstein "is not a person that diagnoses" and that his

discretion by declining to admit testimony that the defense had represented it would not offer and that the witness was not in a position to give.[27]

## Sentencing Issues

¶27 <u>Prior Convictions.</u> Johnson next contends the court erred by counting his prior robbery convictions as strikes for purposes of the POAA. He argues the crimes are not comparable to Washington felonies and are constitutionally invalid. We disagree.

¶28 To determine whether a foreign conviction should count as a strike crime, the court employs a two part test to determine the comparability of the foreign offense.[28] The first question is whether the elements of the foreign offense are substantially similar to the Washington offense. If the elements of the foreign offense are broader, the court must then determine whether the offense is factually comparable, i.e., whether the conduct underlying the foreign offense would have violated the comparable Washington statute.[29] If a factual analysis is necessary, the court considers only facts admitted or stipulated by the defendant or proved beyond a reasonable doubt.[30] If the foreign

---

testimony was intended as a precursor to Whiteside's, though scheduling required him to testify after Whiteside. *Id.* When the court asked if Bookstein would be testifying about Johnson, defense counsel responded, "No, not specifically." *Id.* at 8. And in the midst of her offer of proof about Bookstein's testimony, Tyson reiterated that Bookstein "does not have an opinion . . . about the specific defendant" with regard to the ability to tell right from wrong. *Id.* at 128.

[27] Johnson first advised the court that Bookstein would have testified specifically about Johnson's ability to tell right from wrong and to form intent in the written offer of proof that accompanied his motion to arrest judgment. The court denied the motion in part because counsel had represented that Bookstein would not testify on those matters. On appeal, Johnson complains that the court's explanation relied on "a single incorrect pretrial statement" by attorney Faller, when it was attorney Tyson who conducted Bookstein's direct examination. Appellant's Br. at 35. As noted above, however, Tyson repeatedly stated during trial that Bookstein would not offer opinions about Johnson in particular.

[28] *In re Pers. Restraint of Lavery*, 154 Wn.2d 249, 255, 111 P.3d 837 (2005).

[29] *Id.*

[30] *Id.* at 258.

conviction is neither legally nor factually comparable, it may not be counted as a strike under the POAA.[31]

¶29 The State established that Johnson had two prior convictions in Oregon for robbery in the first degree. The general offense of "robbery" is defined in Oregon Revised Statutes (ORS) § 164.395 as follows:

(1) A person commits the crime of robbery in the third degree if in the course of committing or attempting to commit theft . . . the person uses or threatens the immediate use of physical force upon another person with the intent of:

(a) Preventing or overcoming resistance to the taking of the properly or to retention thereof immediately after the taking.

"First degree robbery" is further defined as:

(1) A person commits the crime of robbery in the first degree if the person violates ORS § 164.395 and the person:

(a) Is armed with a deadly weapon;

(b) Uses or attempts to use a dangerous weapon.[32]

Oregon law defines "theft" as "when, with intent to deprive another of property or to appropriate property to the person or to a third person, the person . . . [t]akes, appropriates, obtains or withholds such property from an owner thereof."[33]

¶30  Under Washington law, "robbery" is defined as follows:

A person commits robbery when he unlawfully takes personal property from the person of another or in his presence against his will by the use or threatened use of immediate force, violence, or fear of injury to that person or his property or the person or property of anyone. Such force or fear must be used

---

[31] *Id.*

[32] ORS § 164.415.

[33] ORS § 164.015(1).

to obtain or retain possession of the property, or to prevent or overcome resistance to the taking.[34]

¶31 Johnson contends the Oregon law does not require that a robbery involve taking property "from the person of another or in his presence," but that requirement is implicit. The Oregon statute requires that the accused "use[ ] or threaten[ ] the immediate use of force upon another person" "in the course of committing or attempting to commit theft," which occurs when the accused "takes . . . property from an owner thereof."[35] To be threatened with immediate force during the theft, the property owner logically must be present. The elements of the Oregon robbery statute are substantially similar to the Washington statute. The offenses are legally comparable.[36]

¶32 Johnson also argues the Oregon convictions cannot be counted as strikes because they are invalid under Washington's constitutional requirement for a 12 member unanimous jury, which Oregon does not require. But if a conviction is not constitutionally invalid on its face, the State need not establish its constitutionality in order for it to be counted as part of the defendant's criminal history.[37] A conviction is valid on its face unless it shows constitutional infirmities without further elaboration.[38] Neither of the Oregon convictions is invalid on its face.[39]

---

[34] RCW 9A.56.190.

[35] ORS §§ 164.395(1), .415(1), .015.

[36] See State v. McIntyre, 112 Wn. App. 478, 49 P.3d 151 (2002) (holding the crime of third degree robbery in Oregon is legally comparable to the crime of second degree robbery in Washington). The offenses are also factually comparable. In each case, the jury found or Johnson admitted that he threatened the immediate use of force upon the victim and used a dangerous weapon in the course of committing theft, with the intent of preventing or overcoming resistance. In other words, Johnson stole property while threatening its owner with a dangerous weapon to prevent or overcome resistance. This conduct was punishable as robbery in Washington.

[37] State v. Ammons, 105 Wn.2d 175, 187, 713 P.2d 719, 718 P.2d 796 (1986).

[38] Id. at 188.

[39] Even if we accepted Johnson's argument that convictions resulting from nonunanimous verdicts were constitutionally invalid, neither of the convictions in

¶33 In any event, the question is not whether a prior conviction meets Washington's constitutional requirements. The question is whether the conviction is valid under the United States Constitution and the constitution of the jurisdiction in which it was obtained.[40] Neither the federal constitution nor that of Oregon requires a unanimous jury.[41] Johnson's Oregon convictions would count as strikes even if based on nonunanimous verdicts.

¶34 <u>Cruel Punishment.</u> Johnson next argues that his sentence of life without parole is unconstitutionally cruel punishment under article I, section 14 of the Washington Constitution. Though our Supreme Court has held that the POAA does not itself constitute cruel punishment, it "recognize[d] there may be cases in which application of the Act's sentencing provision runs afoul of the constitutional prohibition against cruel punishment."[42] The court has, however, rejected this argument in several cases very similar to this one.[43]

¶35 Johnson acknowledges his situation is similar to those in which POAA sentences have been upheld. He argues, however, that a life sentence without the possibility of parole is unconstitutionally cruel in his case because of

---

question show such an infirmity on their face. One resulted from a guilty plea; the other does not indicate whether the jury was unanimous or not.

[40] *State v. Gimarelli*, 105 Wn. App. 370, 377, 20 P.3d 430 (2001) (holding that nonunanimous Oregon convictions can be counted as strikes under the POAA); *State v. Morley*, 134 Wn.2d 588, 619, 952 P.2d 167 (1998) (holding that courts could count a general court martial as a prior conviction for sentencing purposes, despite the fact that military courts did not provide various constitutional protections, including the requirement for a unanimous verdict).

[41] OR. CONST. art. I, § 11; *Apodaca v. Oregon*, 406 U.S. 404, 413, 92 S. Ct. 1628, 32 L. Ed. 2d 184 (1972) (plurality opinion).

[42] *State v. Thorne*, 129 Wn.2d 736, 773 n.11, 921 P.2d 514 (1996).

[43] In *State v. Rivers*, 129 Wn.2d 697, 712-15, 921 P.2d 495 (1996), for example, the defendant was convicted of second degree robbery and had prior convictions for attempted second degree robbery, second degree robbery, and second degree assault. In *State v. Manussier*, 129 Wn.2d 652, 677-79, 921 P.2d 473 (1996), the court upheld a POAA sentence for a defendant convicted of second degree robbery with two prior convictions for first degree robbery. And in *Thorne*, 129 Wn.2d at 772-76, the court upheld a POAA sentence for a defendant convicted of first degree robbery and first degree kidnapping with prior convictions for first and second degree robbery.

his mental disorder. He relies on *Atkins v. Virginia*,[44] in which the United States Supreme Court held it unconstitutional to execute a defendant with mental retardation, in part because such defendants have mental conditions that necessarily make them both less culpable and less likely to be deterred by the specter of capital punishment. Johnson attempts to import this reasoning to his case. As the State points out, however, the death penalty is unique and cannot be compared to a sentence under the POAA.[45] *Atkins* is inapposite.

¶36 Further, Johnson's argument requires us to accept his evidence that FASD and other impairments rendered him less culpable. But the State's expert testified that Johnson does not suffer the cognitive defects upon which this argument depends, and the jury evidently believed that Johnson was able to form the requisite intent and knew right from wrong.

¶37 Finally, Johnson portrays himself as essentially nonviolent because he did not use a weapon in the Washington robberies. He argues that this fact, together with his mental condition, demands a more lenient sentence. But Johnson threatened to kill three bank tellers who did not know he was unarmed. In his Oregon crimes, he used a knife and gun to threaten his victims. On this record, we cannot agree that a POAA sentence was unconstitutionally cruel.

¶38 *Apprendi* Violation. Johnson lastly argues the POAA violates the Sixth and Fourteenth Amendments by allowing a sentence enhancement based upon previous convictions that were not proved to a jury beyond a reasonable doubt. Washington courts have repeatedly rejected this argument, holding "that *Apprendi* and its progeny do not

---

[44] 536 U.S. 304, 318, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

[45] *See, e.g., State v. Martin*, 94 Wn.2d 1, 21, 614 P.2d 164 (1980) (Horowitz, J., concurring) ("The United States Supreme Court has more than once reminded us of the indisputable fact that 'death is different,' and that this difference must impact on the court's decisionmaking, requiring the utmost solicitousness for the defendant's position.").

require the State to submit a defendant's prior convictions to a jury and prove them beyond a reasonable doubt."[46]

¶39 Affirmed.

SCHINDLER, C.J., and COX, J., concur.

Review denied at 167 Wn.2d 1012 (2009).

---

[46] *State v. Thiefault*, 160 Wn.2d 409, 418, 158 P.3d 580 (2007) (citing *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)).