IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 75039-9-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MARCOS APODACA, | ) | |
| | ) | |
| Appellant. | ) | FILED: June 20, 2016 |

2016 JUN 20 AM 10: 36
COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

SCHINDLER, J. — Marcos Apodaca seeks reversal of the theft of a motor vehicle and violation of a no-contact order convictions. We conclude the trial court violated his constitutional right to present a defense by excluding evidence that the State's central and crucial witness had a motive to lie. Because the error was not harmless beyond a reasonable doubt, we reverse.

FACTS

Marcos Apodaca and Sabra Kelly were involved in a romantic relationship beginning in July 2012. The relationship ended by early 2014.

On November 16, 2014, Kelly called 911 to report Apodaca had stolen her car. The State charged Apodaca with theft of a motor vehicle. At arraignment, Apodaca entered a plea of not guilty and the court entered a no-contact order with Kelly. In an

amended information, the State charged Apodaca with theft of a motor vehicle and violation of a no-contact order.

Apodaca's defense was that he had permission to take Kelly's car and did not contact Kelly after the court entered the no-contact order. The State called a number of witnesses at trial including Kelly, Pierce County Sheriff Deputy Inga Carpenter, Pierce County Sheriff Deputy Alexa Moss, and Pierce County Sheriff Corrections Deputy Don Carn.

Kelly testified Apodaca took her car without her permission. Kelly said that on November 16, she heard her car start while taking a shower. Kelly noticed her car keys were missing from her bedroom, looked out the window, and saw Apodaca driving away in her car. Kelly testified she allowed Apodaca to drive her car during their relationship "but that was . . . years before."

Kelly said she learned through social media that Apodaca was staying at a house near Pacific Lutheran University. Kelly testified she and Doug Stenge drove to the house. Stenge owns the house Kelly had lived in for 13 years. Kelly and Stenge found her car parked in the street near a Pacific Lutheran University parking lot. Kelly saw Apodaca sitting inside a nearby house through a window. Kelly banged on the door and demanded to talk to Apodaca. Kelly told Apodaca she wanted her car keys and she was calling the police. Apodaca gave Kelly the keys to her car. Kelly returned to her car and called the police.

Kelly testified that after the court issued the no-contact order, she received a call on her cell phone. Kelly said an automated message informed her the call was from

"Danny or Benjamin" at the Pierce County Jail. Kelly testified she recognized the voice as Apodaca's and hung up.

Deputy Carpenter and Deputy Moss testified that Apodaca denied stealing Kelly's car. Apodaca told the deputies he had spent the night at Kelly's house, they got into an argument the next day, and Kelly refused to give Apodaca a ride into town.

Corrections Deputy Carn testified a call had been made to Kelly's phone from the jail. Deputy Carn testified inmates sometimes use other inmates' PIN[1] to place phone calls.

Apodaca called Beverly Wilcoxson to testify on behalf of the defense. Apodaca sought to introduce evidence showing he and Kelly were still romantically involved and Kelly lied to hide their ongoing relationship from her boyfriend Doug Stenge.

Before Wilcoxson testified, the State objected to any testimony regarding Kelly's alleged relationship with a "male benefactor."

> [I]n previous conversations with Ms. Wilcoxson she had indicated to me that it was her belief that it was known that Ms. Kelly had a relationship with a male benefactor which she termed "a sugar daddy" that had some sort of involvement in this incident.
> And I would move to exclude any reference to that term, any reference to Ms. Kelly having a reputation as having a male benefactor or this other relationship. I'm trying to find a phrase to put it as delicately as possible. It's not only not relevant, but it's impermissible character testimony and reputation evidence.

Apodaca argued that evidence of Kelly's relationship with Stenge was relevant to the defense theory of the case and to Kelly's credibility. Apodaca asserted he had personal knowledge and would also testify about the relationship between Kelly and

---

[1] Personal identification number.

Stenge.

> Well, the Defense theory of the case is based on the investigation, what it turned out was we felt what was going on was that Ms. Kelly was, in fact, dating—it was Mr. Stenge, who's the owner of the house that she was living in. And this common knowledge, so to speak, was that every time Stenge came around, she would kick Mr. Apodaca out of the house. And that was part of the situation, that Mr. Stenge noticed that the vehicle was missing, and so Ms. Kelly cooked up this story in order to essentially cover her involvement or her double dealing, if you will, with Mr. Apodaca.
>
> I don't know what Ms. Kelly is going to—how much of this she's even going to substantiate. I suspect she probably won't go there or is not going to want to go there. But Mr. Apodaca has some personal knowledge of this. And if he were to testify, that would be something, I think, that would be relevant and would go to Ms. Kelly's credibility and give her motive to lie.

The State argued the evidence constituted impermissible character evidence that was more prejudicial than probative. Apodaca emphasized Kelly's credibility was crucial to the charges against him and relevant to her motive to lie.

> That she owned the car, and that essentially is the only fact, so to speak, that was verified. And then when you have—when the car is actually found, the two officers, the two deputies, that then showed up found her in possession of the vehicle and the keys. So, in essence, this entire case rests entirely on Ms. Kelly's word, so to speak, that this was wrongfully obtained.
>
>     . . . .
>     . . . It clearly—whether or not he had authorization to do this, the only witness in this that can testify to that is either Mr. Apodaca or Ms. Kelly. And she's asserting—and she's the only one asserting at this point that he stole—that he's alleged to have stole this vehicle. Her credibility is crucial to this, and if she has got a motive to lie, if she has got a motive to make something up to the police. And I think it's a significant motive. It proves that if this Doug Stenge finds out that she's actually seeing Mr. Apodaca on the side, then maybe financial benefits that she has obtained, i.e., the house, would go away. She would have a significant motive to lie and to make something up to the police.

The court acknowledged the evidence "would provide some motivation for Ms. Kelly to falsify her testimony" and "may have some relevance." However, the court

4

excluded the evidence under ER 403.

> Well, credibility is always an integral part of the jury's contemplation. I think that just inquiring into the nature of other relationships and who owns the house and does she pay rent there and what are the circumstances, it may have some marginal relevance. But under the 403 balancing test, I don't think you're there.

Wilcoxson testified Apodaca was at her house on November 17. Wilcoxson said Kelly came over to the house looking for Apodaca and asked Apodaca to return her car keys. Wilcoxson testified Kelly had been to her house once before several months earlier and she heard Kelly ask Apodaca for her car keys.

Apodaca testified. Apodaca said he was at Kelly's house on November 14, they had sex, and then he spent the night. Apodaca testified he went back to Kelly's house the next day and spent the night again. After he woke up on November 16, he asked Kelly to give him a ride into town. Apodaca said Kelly was in the shower and he was downstairs. Apodaca testified he heard Kelly yell, "You've got my keys" while she was in the shower. Apodaca interpreted this as permission to take her car. Apodaca said Kelly "lets anybody drive her car" and he had driven her car several times in 2012.

Apodaca said he drove to Wilcoxson's house located near Pacific Lutheran University. The next day, Kelly came to the house and asked for the keys to her car. Apodaca said he and Kelly had a normal, calm conversation and Apodaca returned the keys.

Apodaca admitted telling the deputies that he had not spoken to Kelly "until 20 minutes ago." Apodaca said he did not remember telling the deputies that he had not seen Kelly for a few weeks and that he had not taken her car. Apodaca also did not

5

remember telling the deputies that he waited until Kelly walked outside and then took her car. Apodaca told the deputies he previously drove Kelly's car several times.

The jury convicted Apodaca as charged of theft of a motor vehicle and violation of a no-contact order. The court imposed a concurrent sentence of 48 months for theft of a motor vehicle and 364 days for violating a no-contact order.

## ANALYSIS

Apodaca argues the trial court violated his constitutional right to present a defense by excluding evidence that the State's central witness had a motive to lie. The State argues Apodaca failed to make an offer of proof sufficient to preserve his claim. We disagree.

A defendant may claim error based on excluded evidence as long as "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." ER 103(a)(2). An offer of proof serves three purposes to meet the requirements of ER 103(a)(2):

> [An offer of proof] informs the court of the legal theory under which the offered evidence is admissible; it informs the judge of the specific nature of the offered evidence so that the court can assess its admissibility; and it creates a record adequate for review.

State v. Ray, 116 Wn.2d 531, 538, 806 P.2d 1220 (1991). A formal offer of proof is not necessary "if the substance of the excluded evidence is apparent from the record." Ray, 116 Wn.2d at 539. "The substance of an offer of proof need not be made known in detail." In re Detention of McGary, 175 Wn. App. 328, 337, 306 P.3d 1005 (2013).

Here, the record is adequate for review. The colloquy shows the court understood the nature of the evidence Apodaca sought to introduce and the legal theory under which Apodaca believed it was admissible. The defense theory was that

6

Apodaca and Kelly were still romantically involved and that Kelly lied to hide their ongoing relationship from Stenge. Defense counsel presented evidence that Stenge owned the house Kelly lived in. Apodaca had personal knowledge about the relationship between Kelly and Stenge. Testimony would show her motive to lie: if "Doug Stenge finds out that [Kelly's] actually seeing Mr. Apodaca on the side, then maybe financial benefits that she has obtained, i.e., the house, would go away." Defense counsel argued the evidence is "relevant . . . to Ms. Kelly's credibility and give[s] her [a] motive to lie." The offer of proof preserved this error for appellate review. See Ray, 116 Wn.2d at 539 ("The extended colloquy between the prosecutor, defense attorney, and the court, however, revealed the substance of the evidence that Ray wished to introduce and the theory under which it was offered . . . . ER 103(a)(2) does not require that the details of the testimony be apparent.").

We review an alleged denial of the constitutional right to present a defense de novo. State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010). We review evidentiary decisions for an abuse of discretion. State v. Johnson, 150 Wn. App. 663, 673, 208 P.3d 1265 (2009). "Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993).

Apodaca argues the trial court violated his right to present a defense by excluding testimony that Kelly had a motive to lie. We agree. Whether rooted in the compulsory process clause of the Sixth Amendment or the due process clause of the Fourteenth Amendment, the United State Constitution guarantees a criminal defendant " 'a meaningful opportunity to present a complete defense.' " Holmes v. South Carolina,

7

547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986)). The fundamental due process right to present a defense is the right to offer testimony and compel the attendance of a witness. "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). "It is reversible error to deny a defendant the right to establish the chief prosecution witness's bias by an independent witness." State v. Spencer, 111 Wn. App. 401, 408, 45 P.3d 209 (2002); see also Olden v. Kentucky, 488 U.S. 227, 232-33, 109 S. Ct. 480, 102 L. Ed. 2d 513 (1988). However, a defendant must show offered evidence is at least minimally relevant to facts at issue in the case. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010).

Evidence of bias is relevant to a witness's credibility. "Where a case stands or falls on the jury's belief or disbelief of essentially one witness, that witness' credibility or motive must be subject to close scrutiny." State v. Roberts, 25 Wn. App. 830, 834, 611 P.2d 1297 (1980). A defendant has a right to present facts showing a witness's bias unless those facts are only remotely relevant or overly prejudicial. See Spencer, 111

Wn. App. at 408. "Evidence offered to impeach a witness is relevant only if (1) it tends to cast doubt on the credibility of the person being impeached, and (2) the credibility of the person being impeached is a fact of consequence to the action." State v. Allen S., 98 Wn. App. 452, 459-60, 989 P.2d 1222 (1999).

Kelly's credibility was a central issue in the case. The defense theory was that Kelly was not credible. Wilcoxson was prepared to testify about her knowledge that Kelly was in a relationship with a "sugar daddy" or male benefactor involved with the incident. Defense counsel stated Apodaca had personal knowledge and would testify about Kelly's relationship with Stenge. The trial court agreed the offered evidence would be relevant on the issue of credibility. Kelly was the only witness who testified that Apodaca did not have permission to take her car and that he contacted her after the court imposed a no-contact order. Kelly's credibility was undeniably a fact of consequence in the case. The State never articulated grounds for prejudice other than the offered testimony constituted "improper character evidence." See State v. Hudlow, 99 Wn.2d 1, 13-14, 659 P.2d 514 (1983) (possible embarrassment to the complaining witness cannot justify exclusion of evidence establishing bias).

We conclude the trial court erred by preventing Apodaca from presenting evidence that Kelly had a motive to lie. The evidence here was highly probative of a central witness's credibility and the State failed to show prejudice substantially outweighed Apodaca's right to present that evidence. Because the error infringes on Apodaca's right to present a defense, reversal is required unless the State can demonstrate it was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). The State does not argue the error

9

is harmless beyond a reasonable doubt. We are not "convinced beyond a reasonable doubt that the evidence . . . [was] so overwhelming that it necessarily leads to a finding of guilt." State v. Trujillo, 112 Wn. App. 390, 405 n.10, 49 P.3d 935 (2002); see also Olden, 488 U.S. at 232-33. We cannot say the jury's evaluation of Kelly's credibility would have been the same had Apodaca been permitted to present the evidence showing Kelly had a motive to lie.

> We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. . . . [T]he jurors [are] entitled to have the benefit of the defense theory before them so that they [can] make an informed judgment as to the weight to place on [the witness's] testimony which provided "a crucial link in the proof . . . of [the defendant's] act."

Davis v. Alaska, 415 U.S. 308, 317, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974) (quoting Douglas v. Alabama, 380 U.S. 415, 419, 85 S. Ct. 1074, 13 L.E.2d 934 (1965)). Because the error was not harmless beyond a reasonable doubt, we reverse the conviction of theft of a motor vehicle and violation of a no-contact order.

WE CONCUR:

Trickey, ACJ

Spearman, J.