IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                Respondent,<br><br>        v.<br><br>CORDONTE LORENZ WALKER,<br><br>                Appellant. | No. 86447-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — CorDonte Walker appeals from convictions for murder in the second degree—felony murder and unlawful possession of a firearm in the second degree. Walker contends that his conviction under the felony murder statute violated his right to substantive due process, the trial court erred as to a number of evidentiary rulings and a sanction due to a purported discovery violation, and cumulative error deprived him of a fair trial. We disagree and affirm.

FACTS

Lurdes Keymolen, Walker's girlfriend, was killed early in the morning of August 27, 2020 in Kent. Walker and Keymolen's family would later testify that the couple had spent the previous day, Keymolen's birthday, together and concluded the evening with a few hours of celebration at her family's house. Initially, Keymolen left without Walker, but later returned to collect him. Keymolen was driving Walker's vehicle when they left her family's home together.

Alex Chebotar, who lived in the area, was the State's primary witness regarding the incident on which the charges were based. He was outside when he heard yelling that he described as sounding "like a person in distress"; he later testified, "It was like yelling like someone really needed help and it was [sic]— getting hurt." Chebotar grabbed his pistol and headed towards the sound. He continued to approach because he could see someone "basically getting beat up[,] crawl out and cross the road." He watched the woman, later identified as Keymolen, shout at a man, later identified as Walker, and saw Walker dump out the contents of a purse in the road. Chebotar explained that he observed Walker get back in the car, begin to drive, turn the wheels of the vehicle towards the sidewalk, rapidly accelerate, and strike Keymolen with the car. Chebotar confronted Walker when he exited the vehicle; he saw Walker reach toward his waistband, so Chebotar pointed his gun at Walker and kept it trained on him as Walker attempted to get Keymolen into the car. Chebotar called 911 during this altercation and shot out two of Walker's tires as he drove away from the scene.

Kent Police Department (KPD) responded to the dispatch based on Chebotar's call. KPD Officers Matthew Levi and Patrick Baughman would later testify that they encountered Walker in a parking lot after searching the area for the vehicle and people described in the 911 call. KPD Sergeant Melanie Robinson located the vehicle and Keymolen's body. Robinson and the other officers provided "life-saving efforts" until the fire department arrived. KPD Officer Jason Windham also responded to the scene and later described Keymolen's injuries as follows:

> She had what looked to be fractures in her legs. They were mangled and bent back behind her. She had abrasions on several areas of her body and what appeared to be a bite mark on her, I believe, left cheek.

Keymolen was pronounced dead at the scene.

On August 31, the State charged Walker with one count of murder in the first degree with a special allegation of domestic violence and one count of unlawful possession of a firearm in the second degree (UPF2). Roughly two and a half years later, in May 2023, the State filed an amended information that retained the charges for murder in the first degree (count 1) and UPF2 (count 4) and added two additional allegations of murder in the second degree, one presented as intentional murder (count 2) and the other as felony murder predicated on assault in the second degree (count 3). All three murder charges were designated as domestic violence offenses based on Walker's relationship to Keymolen.

Walker filed his trial brief and motions in limine the following September and sought to exclude evidence from Keymolen's phone on the basis that it was impermissible hearsay and any testimony of prior discord between the couple as "prior bad acts" evidence under ER 404(b). Walker also filed a motion to sever the UPF2 charge, which the State opposed. The State filed its own trial brief roughly a week later as well as other motions addressing the matters Walker raised.[1] After the trial court heard argument on the various evidentiary issues, it entered findings of fact and conclusions of law regarding the ER 404(b) challenges. The trial court found that a preponderance of the evidence established that the past misconduct

---

[1] We note that the trial brief was not included in the record on appeal, although the record does contain a pocket brief addressing one of Walker's motions in limine and the State's response to Walker's motion to suppress.

- 3 -

Walker sought to exclude from trial had occurred, the purpose of the evidence was "to show motive, intent, and absence of mistake or accident," and, after the court had "balanced the probative value of the evidence against its prejudicial effect," concluded that it was relevant for that purpose. The trial court further concluded that the State's proffered testimony from the couple's neighbors, Keymolen's work supervisor, portions of Keymolen's text correspondence with Walker and statements to friends, and the observations of her family were admissible. The trial court also granted Walker's motion to bifurcate the UPF2 charge from the murder charges.

The case proceeded to trial in October. The jury heard testimony from members of law enforcement who had responded to the scene or otherwise investigated the case, Keymolen's friends, family, and acquittances, some of the couple's neighbors, and Walker himself. Shortly before the State rested its case, the trial court granted leave to file a second amended information that eliminated the allegation of murder in the second degree—intentional murder. The State explained that it intended to have the jury consider murder in the second degree—intentional murder, manslaughter in the first degree, and manslaughter in the second degree as lesser included offenses of murder in the first degree as charged in count 1. The second amended information then reflected the charges as follows: murder in the first degree (count 1), murder in the second degree—felony murder (count 2), and UPF2 (count 3).

The jury acquitted Walker of murder in the first degree but returned a guilty verdict on count 1 for the lesser included offense of manslaughter in the first degree

and on count 2 for murder in the second degree—felony murder. The jury also returned a special verdict that concluded the State had proved Walker and Keymolen were intimate partners for purposes of the domestic violence designation. The trial court then conducted a bench trial on the bifurcated UPF2 charge and found Walker guilty of that offense. On March 18, 2024, the trial judge sentenced Walker to 204 months in prison for the conviction for murder in the second degree and 5 months for UPF2, to run concurrently, followed by 36 months of community custody. The trial court also dismissed and vacated the conviction for manslaughter in the first degree in count 1 on double jeopardy grounds.

Walker timely appealed.

ANALYSIS

Walker avers that reversal of his convictions is required because the manner by which the State charged his case violated his right to substantive due process and certain evidentiary rulings, a sanction imposed as a result of a discovery violation, and cumulative error deprived him of a fair trial. We disagree.

I.      Substantive Due Process

In his opening brief, Walker avers that his conviction under Washington's felony murder statute violated his right to substantive due process because "the conduct underlying [his] convictions [in counts 1 and 2] is virtually indistinguishable, and the jury did not need to find any scienter to elevate manslaughter into second degree murder." He contends the manner by which the State charged the case "violates the fundamental scienter requirement and thus Mr. Walker's right to substantive due process" and, at oral argument before this

court, clarified that this implicates his fundamental right to freedom from imprisonment.[2] The State responds that Walker's argument "has been repeatedly rejected" by our courts. The State is correct.

The federal and state constitutions both protect accused persons from deprivation of "life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 3. Our "inquiry begins with 'the nature of the right involved.'" *State v. Sindars*, 33 Wn. App. 2d 504, 511, 562 P.3d 826 (2025) (internal quotation marks omitted) (quoting *Yim v. City of Seattle*, 194 Wn.2d 682, 689, 451 P.3d 694 (2019)), *review denied,* No. 103861-5 (Wash. Apr. 29, 2026). "If the government has interfered with a fundamental right, we apply strict scrutiny and ask whether 'the infringement is narrowly tailored to serve a compelling state interest.'" *Id.* at 511-12 (internal quotation marks omitted) (quoting *Yim*, 194 Wn.2d at 689). We engage in rational basis review of the State's interference with a nonfundamental right, "requiring only a rational relationship between the challenged action and a legitimate State interest." *State v. Nelson*, 32 Wn. App. 2d 679, 686, 558 P.3d 197 (2024), *aff'd sub nom.*, *State v. Danielson*, 5 Wn.3d 690, 580 P.3d 441 (2025).

Here, Walker's initial contention is that the conduct underlying the jury's finding of guilt for manslaughter in the first degree and murder in the second degree—felony murder, predicated on assault in the second degree, is identical. He is incorrect. A review of the statutes, relevant jury instructions that set out the

---

[2] Wash. Ct. of Appeals oral arg., *State v. Walker*, No. 86447-5-I (Nov. 13, 2025), at 26 min., 53 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025111127/.

prohibited conduct, and resulting guilty verdicts, clearly establishes that the conduct underlying each crime is, in fact, distinct. Additionally, to the extent Walker relies on *State v. Blake* to argue that strict liability offenses violate due process, we note that our state Supreme Court limited that holding to the criminalization of "'essentially innocent' conduct,'" and further directed that the holding "applies with special force to passive—or nonconduct—that is unaccompanied by intent, knowledge, or mens rea." 197 Wn.2d 170, 179-80, 481 P.3d 521 (2021) (quoting *City of Seattle v. Pullman*, 82 Wn.2d 794, 800, 514 P.2d 1059 (1973)). The charges Walker faced at trial are not strict liability crimes because each contains a mens rea element. *See State v. Yishmael*, 195 Wn.2d 155, 163-64, 456 P.3d 1172 (2020).

"A person is guilty of manslaughter in the first degree when: (a) He or she *recklessly* causes the death of another person." RCW 9A.32.060(1) (emphasis added). Here, the jury was properly instructed that a "person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that a death may occur and this disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation." Additionally, other definitional jury instructions included explanations that a "person commits the crime of assault in the second degree when he or she *intentionally assaults another* and thereby recklessly inflicts substantial bodily harm or assaults another with a deadly weapon" and that an "assault is an intentional touching or striking of another" and "also an act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a

reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury." (Emphasis added); *see also* RCW 9A.36.021(1)(a). Each of these offenses contains a distinct mens rea; manslaughter in the first degree is a crime that only requires recklessness, while assault in the second degree is a crime that requires intentional conduct. As such, the simple procedural facts of the charging instrument and the manner by which the State presented its case, reviewed through the lens of the plain language of the relevant criminal statutes, undercuts Walker's claim of a constitutional violation on this basis. While Walker frames this issue as "*elevating* a manslaughter conviction into a second-degree murder conviction without additional proof" (emphasis added), that is simply not what occurred here based on the charging decision of the State and conduct it relied on in seeking to prove its case at trial.

Further, and perhaps more critically, Walker fails to engage with the corresponding constitutional test for the second aspect of this assignment of error anywhere in his briefing on appeal and offers only nonbinding authority in support of his contention that felony murder predicated on assault in the second degree violates due process because of the purported elimination of the requirement to prove scienter, or mental state. For example, Walker quotes extensively from a concurrence in *State v. Gamble*, but this concurrence is expressly intended "to encourage the legislature to take a closer look at the statutory scheme," and more to the point, is not a binding precedent. 154 Wn.2d 457, 470, 114 P.3d 646 (2005) (Madsen, J., concurring). In contrast, in *State v. Numrich*, our state Supreme Court reaffirmed the majority opinion in *Gamble* that "to prove felony murder, the State

- 8 -

is not required to prove any mental element as to the killing itself" and noted that "it is not unusual in criminal law that multiple statutes can be violated by the same set of facts" but the State must still prove each element beyond a reasonable doubt. 197 Wn.2d 1, 15, 17, 480 P.3d 376 (2021). Walker also relies on the dissent from *State v. Tamalini*, 134 Wn.2d 725, 744-46, 953 P.3d 450 (1998) (Sanders, J. dissenting). Again, a dissent, by its very nature, does not control. Further, this non-binding authority does not avail Walker and the majority opinion in *Tamalini* was reaffirmed in *In re Personal Restraint of Bowman*, 162 Wn.2d 334, 172 P.3d 681 (2007).

As to the merits of this portion of the assignment of error, Walker is simply incorrect that the manner by which the State elected to charge this case eliminated its obligation to prove the requisite mental state beyond a reasonable doubt. Murder in the second degree—felony murder, predicated on assault in the second degree, simply has a different mens rea than manslaughter in the first degree. *Compare* RCW 9A.32.050, *and* 9A.36.021, *with* 9A.32.060. While manslaughter requires recklessness, felony murder requires proof that the underlying crime was committed, here, assault in the second degree, which necessarily requires proof of intent as an essential element consistent with the statutory definition of that crime. Accordingly, Walker's contention that his right to due process was violated by eliminating the requirement for the jury to "find any scienter" is without merit.

## II.    Evidentiary Rulings

Walker next asserts that the trial court committed reversible error as to several evidentiary rulings. In particular, he claims that evidence of his history of

conflict with Keymolen was improperly admitted under ER 404(b), the admission of bodycam footage and postmortem photographs showing Keymolen's injuries were irrelevant, cumulative, and highly prejudicial, and the State was permitted to introduce testimonial evidence that did not meet any identified exception to the rule against hearsay. We address each challenge in turn.

A.      ER 404(b) Evidence

Walker contends that the court erred when it admitted evidence of his history of conflict with Keymolen within their relationship, including physical abuse, pursuant to ER 404(b) because "the cumulative prejudice from this evidence vastly outweighed its probative value" and "the court made no effort to limit this evidence." The State avers that because the defense's theory was that Walker's actions were accidental, evidence "contradicting this defense was highly probative, and Washington courts have previously admitted prior domestic violence under similar circumstances." The State is correct.

The trial court's interpretation of an evidentiary rule is a question of law that we review de novo. *State v. Gresham*, 173 Wn.2d 405, 419, 269 P.3d 207 (2012). We then review the trial court's decision to admit evidence for an abuse of discretion. *Id*. The trial court abuses its discretion when its decision is based on untenable grounds or is unreasonable. *State v. Arredondo*, 188 Wn.2d 244, 256, 394 P.3d 348 (2017). ER 404(b) governs the admissibility of other act evidence and establishes the following:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such

as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The trial court must conduct a four-part analysis to determine the admissibility of such other act evidence. Specifically, the trial court is required to

> "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the [permissible] purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect."

*Gresham*, 173 Wn.2d at 421 (quoting *State v. Thang,* 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). The trial court must engage in this analysis on the record. *Arredondo*, 188 Wn.2d at 257. "Much like in cases involving sexual crimes, courts must be careful and methodical in weighing the probative value against prejudicial effect of prior acts in domestic violence cases because the risk of unfair prejudice is very high." *State v. Gunderson*, 181 Wn.2d 916, 925, 337 P.3d 1090 (2014). The trial court should "confine the admissibility of prior acts of domestic violence to cases where the State has established their overriding probative value." *Id.* "'Cumulative evidence is additional evidence *of the same kind to the same point*.'" *State v. Williams*, 96 Wn.2d 215, 223-24, 634 P.2d 868 (1981) (emphasis added) (quoting *Roe v. Synder*, 100 Wash. 311, 314, 170 P. 1027 (1918)).

The State offered a variety of evidence under ER 404(b) to demonstrate the tumultuous nature of Walker and Keymolen's relationship, which was critical to rebut Walker's defense that Keymolen's death was the result of an accident or a mistake, and to prove the element of intent. At the hearing on the motions in limine, the State explained,

[E]specially when there's an accident or mistake that's been alleged, that this strife in the relationship and the hostility in the relationship is, obviously, if someone, you know, accidentally backs out of the driveway and runs over their spouse, it's not necessarily looks like an accident. But, when there's a long period of acrimony, there's threats to kill, there's abuse—he's breaking up her apartment, he's throwing things—it is relevant to whether that was an accident, that he's basically raised is that it was an unintentional assault.

Walker responded:

You know, in terms of disproving accident or—and/or mistake, I think there's a different argument there. We have—the best we can do in terms of dating all of these incidents are at the latest, they occurred in the spring of 2020 when this incident occurred in the late summer of that year. So we're talking about several months between the two of them. . . .
. . .
And we're not just talking about several months temporally. You know, we're talking about a chasm of time, like, in terms of their relationship. So, I mean, there was a period in which she did move out. I mean, and the two of them had reconciled.

The trial court then conducted the proper analysis on the record and entered findings of fact and conclusion of law on the matter.[3] It expressly found that the purpose of the challenged evidence was "to disprove the accident theory, which is the defense theory, and it's to show intent and motive." The trial court also issued two separate limiting instructions to the jury regarding the text messages and evidence of domestic abuse.[4]

---

[3] The court found that the State had established by a preponderance of the evidence, based on the statements of Salafai Mulifai, "Junior" Mamea, Alex Miller, Anescia Gallardo, Yessenia Nuñez Madrueno, and Fabiola Keymolen, and text messages between Walker and Keymolen, that the events in question occurred and the evidence was not more prejudicial than probative.

[4] Instruction no. 8 read:
Certain evidence has been admitted on a conditional basis, meaning you cannot consider it as evidence unless you determine certain conditions have been met. That evidence is three text message conversations in which Ms. Keymolen makes statements against Mr. Walker: August 2, 2020 at 12:50 p.m., August 5, 2020 at 2:11 p.m., and August 11, 2020 at 2:59 p.m.

Walker's briefing on appeal specifically identifies the testimony of Keymolen's mother Fabiola Keymolen, her half-brother Gabriel Keymolen,[5] Salafai Mulifai, Shurail Bletson, Anescia Gallardo, and Yessenia Nuñez Madrueno, as well as the text messages admitted through Detective Eric Wesson, and asserts prejudice based on the cumulative effect of this other act evidence. At oral argument before this court, Walker clarified that the admission of the text messages specifically was the point at which the cumulative effect of this evidence became prejudicial to the point of unfairness that undermined his conviction.[6] However, we note a significant factual clarification with regard to his ER 404(b) arguments. While Walker asserts that the trial court erred in its ER 404(b) analysis as to each piece of evidence he identifies in briefing, in addition to his claim that this evidence from the various sources accumulated such that it was ultimately more prejudicial than probative, he fails to provide sufficient argument as to the

When a person manifests his or her adoption of the statement of another or belief in its truth, that may be considered an admission of the truth of the statement.

A person's silence in a text message may also be considered an admission if the person (1) a person [sic] read an accusatory or incriminating statement sent by another, understood it, and was mentally and physically able to respond; and (2) the statement and circumstances were such that it is reasonable to conclude the person would have responded if there was no intention to acquiesce.

You must decide each alleged admission separately.

Instruction no. 9 read:

Certain evidence has been admitted in this case for only a limited purpose. This evidence consists of testimony and documentary evidence alleging the defendant was abusive toward the victim and that there was discord and hostility in the relationship. This evidence may be considered by you to the extent you find it relevant to the issues of the defendant's motive and intent and whether the defendant's acts were intentional or accidental. You may not consider it for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.

[5] Because they share the same last name, we refer to Keymolen's mother and half-brother by their first names. No disrespect is intended.

[6] Wash. Ct. of Appeals oral arg., *supra,* at 28 min., 24 sec.

- 13 -

prejudice stemming from this evidence outside of the cumulative error framework.[7]

Critically, though, the State does not appear to have offered the testimony of Bletson or Gabriel pursuant to ER 404(b).[8] Walker does not engage with any impact of this procedural fact on his cumulative effect argument.

As a preliminary matter, Walker effectively opened the door to much of this evidence based on his defense theory that he killed Keymolen accidentally, and he conceded this point at oral argument before this court.[9] Walker asserted that he had not intended to run over Keymolen but struck her by accident because he had driven out of the street and into the front yard of a home in order to avoid her. Accordingly, evidence that Walker had purposefully assaulted Keymolen in the past was highly relevant, particularly to prove intent. A careful review of the evidence shows that while this testimony from the various witnesses develops a common theme, the evidence did not become unfairly prejudicial simply by illustrating a broader scope of interactions between Keymolen and Walker during the course of their relationship.

---

[7] Walker asserts in a footnote in his opening brief that he would address "the harmfulness of each evidentiary error in the cumulative error section," but that portion of his brief presents analysis regarding only a few select witnesses and primarily emphasizes his position that

> [t]he prior misconduct evidence came through six witnesses, numerous photographs, and 472 pages of text messages. The sheer amount of this evidence made it likely the jury though Mr. Walker was simply a "'criminal type,' and [was] thus likely to have committed the crime for which he" was charged. *See* [*State v.*] *Lough*, 125 Wn.2d [847,] 853[, 889 P.2d 487 (1995)].

(Some alteration in original.) Such argument is sufficient as to his claim of cumulative error, but he has not carried his burden on appeal to demonstrate resulting prejudice from each separate claimed evidentiary error such that any would individually require reversal.

[8] While State's trial brief is not present in the record transmitted to this court on appeal, the report of proceedings from the hearing that addressed the ER 404(b) evidence establishes that the parties did not discuss Bletson and Gabriel in the context of that evidentiary issue and neither are they mentioned in the trial court's findings of fact and conclusions of law regarding the ER 404(b) evidence.

[9] Wash. Ct. of Appeals oral arg., *supra,* at 27 min., 57 sec.

Neighbors, friends, and family all offered different, but corroborating, narratives. Bletson and Mulifai were both neighbors of the couple who overheard them arguing on multiple occasions. Mulifai even testified that he had heard Walker threaten to kill Keymolen. Notably, Bletson and Mulifai resided at two different apartment buildings, which supported the State's theory of a pattern of conflict that escalated to Walker's abuse of Keymolen. Further, as neighbors, their testimony had probative value, in part, because they were otherwise uninterested parties with regard to the case. Gallardo and Nuñez Madrueno were friends of Keymolen who both testified about a day when Walker called Keymolen repeatedly while they were spending time together with her and each explained that Keymolen told them she wanted to move out of the couple's shared apartment but was afraid to do so. Fabiola testified to two separate times when she came to the couple's apartment to pick up her daughter, Keymolen, "because [Walker] was kicking her out." Fabiola explained that she observed "[y]elling, punching, like, hitting the walls, things like that" and both Walker and Keymolen were yelling at each other in a back-and-forth manner. She also described the state of the apartment on one of her visits; she noted the lights were off, there were "holes in the wall," the "bathroom door was kicked in half," items were "all over the floor," a broken TV was in a back room, "garbage everywhere," and described the apartment simply as "a mess." The text messages admitted through Wesson provided a general characterization of Walker's and Keymolen's text correspondence and described several physical altercations, disagreements, and their tumultuous relationship. This included a camping trip in August of 2020 during which Keymolen found out

that Walker had cheated on her. The text messages establish that Keymolen had accused Walker of breaking her car window, taking her money, and telling her she had to leave during that camping trip.

Again, each of these witnesses testified to different aspects of the troubled relationship; the neighbors both recounted ongoing verbal disputes, the friends related Keymolen's fear of Walker, the family described the state of the apartment and the incidents when Walker had kicked Keymolen out of their shared residence, and the text messages showed the internal dynamics of the relationship. The jury was provided with a fuller picture of the dynamic between the victim and the accused and, due to the different relationships the various witnesses had with the couple, could conduct independent consideration as to each witness' potential for bias or other problems with the reliability of their testimony.

At oral argument before this court, Walker specifically argued that the text messages were excessive even in light of the State's ability to rebut his accident defense.[10] However, when asked by the panel whether there was sufficient unchallenged evidence to rebut the accident defense, counsel for Walker agreed that there was, but maintained that the text messages introduced other topics that went beyond the trial court's ruling on ER 404(b) evidence, particularly Keymolen's repeated allegations about Walker's infidelity, and was therefore superfluous to the point that it became prejudicial.[11] However, even if we agree that the trial court admitted more evidence of other acts than was necessary for the State to establish Walker's intent or rebut his accident defense, we would then consider whether, in

[10] *Id.* at 27 min., 57 sec.
[11] *Id.* at 28 min., 38 sec. to 29 min., 6 sec.

light of the other evidence admitted at trial not challenged on appeal, such admission was harmless.

"In analyzing the erroneous admission of evidence in violation of ER 404(b), we apply the nonconstitutional harmless error standard." *Gunderson*, 181 Wn.2d at 926. We must decide if, "'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *Gresham*, 173 Wn.2d at 425 (internal quotation marks omitted) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986). Here, the testimony of other witnesses, as described *supra*, illustrated the dynamics of Walker and Keymolen's relationship from various outside perspectives in detail and the admitted photographic and video evidence, discussed *infra*, showed the extent and nature of Keymolen's injuries. As Walker conceded at oral argument before this court, this unchallenged evidence refuted Walker's narrative that his actions were accidental.[12] It also established that his actions were intentional and made it reasonably probable that the outcome of the trial was not materially affected by the admission of multiple pages of text messages between the couple, even with the introduction of other unflattering, but largely irrelevant topics, because the testimonial evidence in particular amply demonstrated to the jury that Walker and Keymolen had a tumultuous, abusive relationship. Further, Walker himself testified that he bit and slapped Keymolen after she was struck by the car, purportedly in an attempt to revive her, and the forensic evidence presented at trial established the scope and severity of her injuries. Finally, the verdicts support a conclusion that the jury

---

[12] *Id.* at 28 min., 38 sec.

credited Chebotar's eyewitness testimony regarding his observation of the assault in the bushes, Walker's conduct in operating the vehicle to strike Keymolen and subsequent flight from the scene. Accordingly, even if the trial judge erred in admitting the volume of text messages, we cannot conclude on this record that there was a reasonable probability that the outcome of the trial was materially affected.

### B. Admission of Bodycam Footage and Postmortem Photographs

In briefing, Walker next avers that the trial court erred when it admitted postmortem photographs of Keymolen and officers' bodycam footage from the scene that included their attempts to revive her. Walker contends this evidence was "irrelevant" because he "openly admitted to killing Ms. Keymolen with the car," "the State had less prejudicial ways of demonstrating [her] injuries," and the evidence was cumulative. The State responds that the photo and video evidence was necessary to meet its burden of proof and the "challenged evidence depicted conditions at the scene as they appeared that morning and showed the nature of Keymolen's injuries, both of which were highly probative of Walker's guilt." The trial court did not abuse its discretion when it admitted the evidence.

We again apply the abuse of discretion standard, as described in Section II.A, *supra*, to this challenge to an evidentiary ruling. The trial court can admit "'[a]ccurate photographic representations . . ., even if gruesome, if their probative value outweighs their prejudicial effect.'" *State v. Burkins*, 94 Wn. App. 677, 691, 973 P.2d 15 (1999) (some alteration in original) (quoting *State v. Crenshaw*, 98 Wn.2d 789, 806, 659 P.2d 488 (1983)). The same is true of video evidence. *Id.*

Our Supreme Court has held that violent crime cannot be adequately explained to the jury if it is completely sanitized. *Crenshaw*, 98 Wn.2d at 807. "Unless it is clear from the record that the primary reason to admit gruesome photographs is to inflame the jury's passions, appellate courts will uphold the decision of the trial court." *State v. Daniels*, 56 Wn. App. 646, 649, 784 P.2d 579 (1990). The State has the right to present such evidence "to amply prove every element of the crime charged, and to rebut all defenses," even if this results in "substantial duplication" of other evidence. *Id.* at 650. ER 403 authorizes the exclusion of evidence "if its probative value is substantially outweighed by . . . needless presentation of cumulative evidence."

Here, the State offered the bodycam footage to show the appearance of Keymolen's body when officers arrived at the scene and to rebut Walker's testimony regarding her injuries. When the trial court ruled to allow the State to play the videos for the jury, it observed the statements of officers therein where admissible pursuant to hearsay exceptions, officers' assessment of her injuries were permissible lay opinions, and any objection Walker might have regarding cumulative evidence would be addressed when the State offered further evidence at trial. Later, the State offered photographs from the scene to rebut statements Walker had made about Keymolen's injuries during his postarrest interview with law enforcement, and Walker objected on the basis that the photos were cumulative of one another. The trial court overruled his objection and admitted both photos because they evinced different injuries to her arm and face.

The State also offered autopsy photos of Keymolen to accompany the testimony of the forensic pathologist and King County medical examiner, Dr. Brian Mazrim, and Walker again objected and argued they were cumulative and unnecessary. When the trial court overruled the defense objection and permitted the State to use the photographs, it noted that the photos were "each showing a different view point of the body," were therefore not duplicative, would "be helpful and illustrative for the medical examiner's testimony," and the bodycam footage that had already been admitted was not suited for that particular purpose. Mazrim then testified that Keymolen's injuries were "consistent with being crushed by the undercarriage of a vehicle" and referred to the challenged photos as he explained the extent of Keymolen's various injuries. The autopsy photos, alongside Mazrim's testimony, served to demonstrate to the jury that Keymolen had likely been fully under the car, which rebutted Walker's claimed initial impression that a piece of his car had fallen off and caused the injuries.

While this photograph and video evidence provided by the State was duplicative to a degree, it did not rise to a level of accumulation such that Walker was prejudiced. Again, "'[c]umulative evidence is additional evidence of the same kind to the same point.'" *Williams*, 96 Wn.2d at 224 (quoting *Roe*, 100 Wash. at 314). The bodycam footage and the photos were distinct in their origins and what they depicted, and the State had a right to present evidence that accurately reflected the severity of the charged crime and to cast doubt on Walker's testimony. The bodycam footage and the photos from the scene rebutted Walker's statements regarding Keymolen's injuries and how she appeared after the incident,

which called into question his assertions that minimized the obviousness of her injuries and was, thus, probative of guilt. Walker has failed to establish error as to the admission of the bodycam footage or autopsy photographs.

### C. Hearsay

Walker also alleges that the court erred when it allowed Alex Miller, Keymolen's work supervisor, to testify about statements Keymolen had made regarding Walker's physical abuse because the "testimony did not comply with ER 803(a)(3) nor any other hearsay exception." The State responds that this evidence was admissible pursuant to ER 803(a)(3) and this error is not preserved because Walker failed to timely object to the purported hearsay at trial. In relevant part, ER 803(a)(3) establishes as an exception to the rule against hearsay, statements "of the declarant's then existing state of mind, emotion, sensation, or physical condition."

Walker assigns error to three specific statements from the following portion of Miller's testimony on direct examination:

> [STATE:] And did you—I guess, did you end up calling the police or were the police called?
>
> [MILLER:] No. She did not want us to call the police.
>
> [STATE:] Okay. And did you push her on that issue at all?
>
> [MILLER:] I did not. *I can clarify in that there was another person who worked for me who was also going through domestic violence previously that summer and when she came with injuries I pushed very hard for her to call the police.*
>
> [WALKER]: I'm going to object to relevance as to this point.
>
> [STATE]: He's answering the question.

THE COURT: Yeah. I'll overrule that. You may finish your answer.

. . . .

[WALKER:] Now you testified that you remember seeing a mark on her neck, and we'll talk about that in just a moment, but you didn't ask about that mark.

[MILLER:] She—I'm not sure what I'm allowed to say. *She was already telling me about the details of the abuse she was receiving* so, no, I did not ask specific questions about a specific mark.

. . . .

[STATE:] Okay. I want to go back to the original question that [counsel for Walker] asked you, and she stated that she never told you about the marks on her neck. And your response was—do you remember your response?

[MILLER:] I told her, like, it was clear to—it was clear through the conversation that we were having what the marks were about.

[STATE:] And why was it clear? How was it clear? You can answer the question.

[MILLER:] She was . . . telling me that *her boyfriend was physically abusing her*.

[WALKER]: Objection. Outside the scope.

THE COURT: Overruled.

(Emphasis added.)

Before reaching the merits of this challenge, we must briefly address preservation of the purported error. Earlier in Miller's testimony, Walker had objected to two of his answers as hearsay and the trial court overruled both objections. Walker requested a sidebar on the matter, but its substance was not put on the record. Walker's objection in the excerpt set out, *supra*, on the basis

that Miller's answer was "[o]utside the scope" likely refers to the trial judge's ruling on the matter addressed during the sidebar. The context is strongly suggestive, but not definitive, that the ruling at the conclusion of the sidebar discussion established the bounds of what hearsay testimony would be admitted.[13] However, even if we assume, without deciding, both that the issue is preserved by the "[o]utside the scope" objection and the trial court erred when it allowed Miller to testify to inadmissible hearsay, we would necessarily also consider whether such error was harmless.

We analyze the "erroneous admission of evidence in violation of an evidentiary rule," such as the hearsay rules, "under the nonconstitutional harmless error standard." *State v. Rocha*, 21 Wn. App. 2d 26, 34, 504 P.3d 233 (2022). "Nonconstitutional error is harmless if 'there is a reasonable probability that, without the error, the outcome of the trial would have been materially affected.'" *Id.* (internal quotation marks omitted) (quoting *State v. Gower*, 179 Wn.2d 851, 854, 321 P.3d 1178 (2014)). Here, the error was harmless because the jury heard admissible testimony about Walker's physical abuse of Keymolen from several other witnesses over the course of the trial. Miller's testimony made only passing references to such abuse, while Fabiola's testimony had already provided much more detail to the jury, as would testimony that would follow Miller's later in the trial. Miller's testimony amounted to a passing corroboration of those other witnesses when considered in the context of the trial as a whole. Walker does not

_____

[13] We take this opportunity to highlight this procedural fact of the case as an example of precisely why it is so important for the content of sidebar discussions to be preserved on the record through summary, supplemental argument, or both at the soonest available opportunity.

establish that there was a reasonable probability that the jury's perception of the issue was impacted by Miller's statements such that the outcome of the trial was materially affected. Accordingly, we decline relief on this issue.

III. Sanction for Discovery Violation

Walker further avers that the trial court erroneously imposed a discovery sanction that prevented the defense accident reconstruction expert, Craig Luker, from testifying "about a study on the reliability of traffic accident witnesses and whether physical evidence contradicted Mr. Chebotar." The State argues that the sanction was proper "based on unfair surprise" because Luker's statement was "a new opinion, and [Walker] had never provided either the study or the simulation." We agree with the State.

"We review discovery violation sanctions for an abuse of discretion." *State v. Barry*, 184 Wn. App. 790, 797, 339 P.3d 200 (2014). A trial court abuses its discretion when its "decision is exercised on untenable grounds or for untenable reasons or is manifestly unreasonable." *Id.* Under the criminal rules, the defendant has a discovery obligation to timely disclose information to the prosecution.

> Except as is otherwise provided as to matters not subject to disclosure and protective orders, the defendant shall disclose to the prosecuting attorney the following material and information within the defendant's control no later than the omnibus hearing: the names and addresses of persons whom the defendant intends to call as witnesses at the hearing or trial, together with any written or recorded statements and the substance of any oral statements of such witness.
>
> . . . .

Medical and Scientific Reports. Subject to constitutional limitations, the court may require the defendant to disclose any reports or results, or testimony relative thereto, of physical or mental examinations or of scientific tests, experiments or comparisons, or any other reports or statements of experts which the defendant intends to use at a hearing or trial.

CrR 4.7(b)(1), (g) (boldface omitted). The criminal rules also establish that the trial court has the power to manage the discovery process, including through the imposition of sanctions.

If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, dismiss the action or enter such other order as it deems just under the circumstances.

CrR 4.7(h)(7)(i). The trial court weighs the following factors when it considers the exclusion of evidence as a remedy for a discovery violation:

(1) the effectiveness of less severe sanctions, (2) the impact of witness preclusion on the evidence at trial and the outcome of the case, (3) the extent to which the witness's testimony will surprise or prejudice the State, and (4) whether the violation was willful or in bad faith.

*State v. Venegas*, 155 Wn. App. 507, 522, 228 P.3d 813 (2010). The "exclusion of evidence is an extraordinary remedy, one that must be applied narrowly." *State v. Ruelas*, 7 Wn. App. 2d 887, 896, 436 P.3d 362 (2019).

On January 27, 2023, the State moved continue the trial based on Walker's untimely disclosure of two expert witnesses, Luker and Dr. Carl Wigren. The State alleged that Walker had failed to provide it with the experts' opinions, despite the fact that Walker had previously indicated readiness to proceed to trial. The trial court gave Walker one week to complete his required disclosure and provide the

experts' opinions to the State. At the next hearing, on February 17, Walker indicated that the experts' opinions had been turned over, but the State disagreed and argued that Walker's disclosure had been inadequate under the discovery rules. At a subsequent hearing in March, the State informed the court that it had still not received a report from Walker's medical expert and other materials the State believed were necessary to prepare for its interviews of each defense expert. At another hearing in May, the State indicated that it would be bringing a motion to compel. The motion to compel was filed May 11 and set out the pretrial procedural history of the case. However, the record on appeal does not establish that the motion was ever noted for a hearing or ruled on by the trial court.

On direct examination, Walker asked if Luker was familiar with "studies about the reliability of eyewitness accounts of traffic accidents" and the State objected, initially on the basis that Luker was not qualified to offer an opinion on eyewitness testimony. The trial court initially called for a sidebar to address the objection but then excused the jury so that the matter could be heard fully on the record. After addressing the proffered reason for the objection, the State further argued,

> [T]he study was never provided to us, and we specifically requested any studies the expert relied upon. We were provided with one but it was not this study. . . . This is prejudicial. It is an unfair surprise.
>     Even if it were not, they want that study to say that eyewitnesses are not reliable.

The court prohibited Walker from asking the question regarding eyewitnesses to car accidents because there was no time to delay the trial so that the State could review the relevant study, although Walker had provided it to the State by the time

the ruling was made. Further, Luker's availability to testify was limited, so delay was not practicable, and going forward with his testimony on this specific matter, despite the untimely disclosure, would have impacted the State's ability to cross-examine him on the late-disclosed information.

The trial court did not abuse its discretion when it excluded portions of Luker's testimony as a sanction for Walker's failure to comply with his discovery obligations. The limited exclusion was an appropriate sanction for Walker's untimely disclosure because it was narrowly tailored, struck a balance with regard to prejudice as to the parties, and was reached after the trial court's careful analysis of the relevant factors. *See Venegas*, 155 Wn. App. at 522; *Ruelas*, 7 Wn. App. 2d at 896. First, the trial court was aware of Luker's narrow window of availability for his participation at trial, which necessarily limited the viable options. This fact eliminated the viability of the less severe sanction of a continuance and delay of Luker's testimony in order to provide the State time to review the study and prepare a rebuttal witness.[14] Second, the trial court's exclusionary ruling as to Luker's testimony was limited in scope. While Walker was prohibited from eliciting testimony from Luker regarding the reliability of eyewitness accounts for purposes of car accident reconstruction, Luker was still able to present his ultimate opinion about the collision which was a crucial part of Walker's overall defense. Finally, the trial court's discovery sanction was as limited as it could be to minimize the

---

[14] The trial court ruled, "[I]f there is not enough time to look at—give [the State] the study and allow [it] to know what it says, then I'm not going to allow you to ask the question. And you have your other testimony in about how—how he does not rely on eyewitness testimony."

The court also left open the possibility of revisiting the challenged portion of Luker's testimony if the report was provided to the State and the State had adequate time to review it and prepare a responsive witness.

prejudice to either party. The prosecutor argued, and the trial court seemingly agreed, that the State would be prejudiced by testimony about the eyewitness reliability study because there was insufficient time for the prosecutor to review and respond to the study. There is no dispute that Walker also experienced a degree of prejudice by the exclusion of this portion of Luker's testimony, and the record indicates Walker was likely going to use this aspect of Luker's testimony to undermine portions of Chebotar's account of the incident. However, Walker was still able to accomplish this defense objective through examination of the physical evidence, Luker's explanation of accident reconstruction, and his cross-examination of Chebotar. The trial court did not abuse its discretion in this limited sanction for Walker's discovery violation.

IV.     Cumulative Error

Finally, Walker alleges that cumulative error deprived him of a fair trial because the prosecutor "made Mr. Walker's prior misconduct central to this case," the trial court allowed inadmissible hearsay testimony, admitted the graphic photographs and video from the crime scene, and excluded a portion of Luker's testimony.

"[A] defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). Reversal may still be warranted "even if each error standing alone would otherwise be considered harmless." *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). However, the cumulative error doctrine does not apply if there were minimal errors and they had "little or no effect on the outcome of trial."

*Id.* Because we conclude that the trial court did not err, the cumulative error doctrine does not apply.

Affirmed.

WE CONCUR: